Mr. Chief Justice Warren
delivered the opinion of the Court.
Involved in this case is an appeal from a decision of the Federal District Court for the District of Colorado upholding the validity, under the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution, of the apportionment of seats in the Colorado Legislature pursuant to the provisions of a constitutional amendment approved by the Colorado electorate in 1962.
I.
Appellants, voters, taxpayers and residents of counties in the Denver metropolitan area, filed two separate actions, consolidated for trial and disposition, on behalf of themselves and all others similarly situated, in March and July 1962, challenging the constitutionality of the apportionment of seats in both houses of the Colorado General Assembly. Defendants below, sued in their representative capacities, included various officials charged with duties in connection with state elections. Plaintiffs below asserted that Art. V, §§ 45, 46, and 47, of the Colorado Constitution, and the statutes[1] implementing those constitutional provisions, result in gross inequalities and disparities with respect to their voting rights. They alleged that “one of the inalienable rights of citizenship ... is equality of franchise and vote, and that the concept of equal protection of the laws requires that every citizen be equally represented in the legislature of his State.” Plaintiffs sought declaratory and injunctive relief, and also requested the Court to order a constitution *848 ally valid apportionment plan into effect for purposes of the 1962 election of Colorado legislators. Proponents of the current apportionment scheme, which was then to be voted upon in a November 1962 referendum as proposed Amendment No. 7 to the Colorado Constitution, were permitted to intervene. A three-judge court was promptly convened.
On August 10, 1962, the District Court announced its initial decision.[2] Lisco v. McNichols, 208 F. Supp. 471. After holding that it had jurisdiction, that the issues presented were justiciable, and that grounds for abstention were lacking,[3] the court below stated that the population *849 disparities among various legislative districts under the existing apportionment “are of sufficient magnitude to make out a prima jade case of invidious discrimination . . . .” However, because of the imminence of the primary and general elections, and since two constitutional amendments, proposed through the initiative procedure and prescribing rather different schemes for legislative apportionment, would be voted upon in the impending election, the District Court continued the cases without further action until after the November 1962 election. Colorado legislators were thus elected in 1962 pursuant to the provisions of the existing apportionment scheme.
At the November 1962 general election, the Colorado electorate adopted proposed Amendment No. 7 by a vote of 305,700 to 172,725, and defeated proposed Amendment No. 8 by a vote of 311,749 to 149,822. Amendment No. 8, rejected by a majority of the voters, prescribed an apportionment plan pursuant to which seats in both houses of the Colorado Legislature would purportedly be apportioned on a population basis.[4] Amend *850 ment No. 7, on the other hand, provided for the apportionment of the House of Representatives on the basis of population, but essentially maintained the existing apportionment in the Senate, which was based on a combination of population and various other factors.
After the 1962 election the parties amended their pleadings so that the cases involved solely a challenge to the apportionment scheme established in the newly adopted Amendment No. 7. Plaintiffs below requested a declaration that Amendment No. 7 was unconstitu *851 tional under the Fourteenth Amendment since resulting in substantial disparities from population-based representation in the Senate, and asked for a decree reapportioning both houses of the Colorado Legislature on a population basis. After an extended trial, at which a variety of statistical and testimonial evidence regarding legislative apportionment in Colorado, past and present, was introduced, the District Court, on July 16, 1963, announced its decision on the merits. Lisco v. Love, 219 F. Supp. 922. Splitting 2-to-l, the court below concluded that the apportionment scheme prescribed by Amendment No. 7 comported with the requirements of the Equal Protection Clause, and thus dismissed the consolidated actions. In sustaining the validity of the senatorial apportionment provided for in Amendment No. 7, despite deviations from population-based representation, the District Court stated that the Fourteenth Amendment does not require “equality of population within representation districts for each house of a bicameral state legislature.” Finding that the disparities from a population basis in the apportionment of Senate seats were based upon rational considerations, the court below stated that the senatorial apportionment under Amendment No. 7 “recognizes population as a prime, but not controlling, factor and gives effect to such important considerations as geography, compactness and contiguity of territory, accessibility, observance of natural boundaries, [and] conformity to historical divisions such as county lines and prior representation districts . ...”[5] Stressing also that the apportionment plan had been recently adopted by popular vote in a statewide referendum, the Court stated:
“[Plaintiffs’] argument that the apportionment of the Senate by Amendment No. 7 is arbitrary, in *852 vidiously discriminatory, and without any rationality [has been answered by the] voters of Colorado .... By adopting Amendment No. 7 and by rejecting Amendment No. 8, which proposed to apportion the legislature on a per capita basis, the electorate has made its choice between the conflicting principles.” [6]
Concluding, the District Court stated:
“We believe that no constitutional question arises as to the actual, substantive nature of apportionment if the popular will has expressed itself. ... In Colorado the liberal provisions for initiation of con *853 stitutional amendments permit the people to act— and they have done so. If they become dissatisfied with what they have done, a workable method of change is available. The people are free, within the framework of the Federal Constitution, to establish the governmental forms which they desire and when they have acted the courts should not enter the political wars to determine the rationality of such action.” [7]
In dissenting, District Judge Doyle stated that he regarded the senatorial apportionment under Amendment No. 7 as irrational and invidiously discriminatory, and that the constitutional amendment had not sufficiently remedied the gross disparities previously found by the District Court to exist in Colorado’s prior apportionment scheme. Instead, he stated, the adopted plan freezes senatorial apportionment and merely retains the former system with certain minor changes. Equality of voting power in both houses is constitutionally required, the dissent stated, since there is no logical basis for distinguishing between the two bodies of the Colorado Legislature. In rejecting the applicability of the so-called federal analogy, Judge Doyle relied on this Court’s decision in Gray v. Sanders, 372 U. S. 368. He concluded that, although absolute equality is a practical impossibility, legislative districting based substantially on population is constitutionally required, and that the disparities in the *854 apportionment of Senate seats under Amendment No. 7’s provisions cannot be rationalized.[8]
Notices of appeal from the District Court’s decision were timely filed, and we noted probable jurisdiction on December 9, 1963. 375 U. S. 938.
II.
When this litigation was commenced, apportionment of seats in the Colorado General Assembly was based on certain provisions of the State Constitution and statutory provisions enacted to implement them. Article V, § 45, of the Colorado Constitution provided that the legislature *855 “shall revise and adjust the apportionment for senators and representatives . . . according to ratios to be fixed by law/’ at the sessions following the state enumeration of inhabitants in 1885 and every 10 years thereafter, and following each decennial federal census. Article Y, § 46, as amended in 1950, stated that “[t]he senate shall consist of not more than thirty-five and the house of not more than sixty-five members.” Article V, § 47, provided that:
“Senatorial and representative districts may be altered from time to time, as public convenience may require. When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be. No county shall be divided in the formation of a senatorial or representative district.”
Article V, § 3, provides that senators shall be elected for four-year terms, staggered so that approximately one-half of the members of the Senate are elected every two years, and that all representatives shall be elected for two-year terms.
Pursuant to these general constitutional provisions, the Colorado General Assembly has periodically enacted detailed statutory provisions establishing legislative districts and prescribing the apportionment to such districts of seats in both houses of the Colorado Legislature. Since the adoption of the Colorado Constitution in 1876, the General Assembly has been reapportioned or redistricted in the following years: 1881, 1891, 1901, 1909, 1913,1932, 1953, and, with the adoption of Amendment No. 7, in 1962.[9] The 1932 reapportionment was an initiated *856 measure, adopted because the General Assembly had neglected to perform its duty under the State Constitution. In 1933 the legislature attempted to thwart the initiated measure by enacting its ow.n legislative reapportionment statute, but the latter measure was held unconstitutional by the Colorado Supreme Court.[10]
The 1953 apportionment scheme, implementing the existing state constitutional provisions and in effect immediately prior to the adoption of Amendment No. 7, was contained in several statutory provisions which provided for a 35-member Senate and a 65-member House of Representatives. Section 63-1-2 of the Colorado Revised Statutes established certain population “ratio” figures for the apportionment of Senate and House seats among the State's 63 counties. One Senate seat was to be allocated to each senatorial district for the first 19,000 popu-' lation, with one additional senator for each senatorial district for each additional 50,000 persons or fraction over 48,000. One House seat was to be given to each representative district for the first 8,000 population, with one *857 additional representative for each House district for each additional 25,000 persons or fraction over 22,400. Sections 63-1-3 and 63-1-6 established 25 senatorial districts and 35 representative districts, respectively, and allocated the 35 Senate seats and 65 House seats among them according to the prescribed population ratios. No counties were divided in the formation of senatorial or representative districts, in compliance with the constitutional proscription. Thus, senators and representatives in those counties entitled to more than one seat in one or both bodies were elected at large by all of the county’s voters. The City and County of Denver was given eight Senate seats and 17 House seats, and Pueblo County was allocated two Senate seats and four House seats. Other populous counties were also given more than one Senate and House seat each. Certain counties were entitled to separate representation in either or both of the houses, and were given one seat each. Sparsely populated counties were combined in multicounty districts.
Under the 1953 apportionment scheme, applying 1960 census figures, 29.8% of the State’s total population lived in districts electing a majority of the members of the Senate, and 32.1% resided in districts electing a majority of the House members. Maximum population-variance ratios of approximately 8-to-l existed between the most populous and least populous districts in both the Senate and the House. One senator represented a district containing 127,520 persons, while another senator had only 17,481 people in his district. The smallest representative district had a population of only 7,867, while another district was given only two House seats for a population of 127,520. In discussing the 1953 legislative apportionment scheme, the District Court, in its initial opinion, stated that “[f] actual data presented at the trial reveals the existence of gross and glaring disparity in voting strength as between the several representative and *858 senatorial districts,” and that “[t]he inevitable effect . . . [of the existing apportionment provisions] has been to develop severe disparities in voting strength with the growth and shift of population.” [11]
Amendment No. 7 provides for the establishment of a General Assembly composed of 39 senators and 65 representatives, with the State divided geographically into 39 senatorial and 65 representative districts, so that all seats in both houses are apportioned among single-member districts.[12] Responsibility for creating House districts “as nearly equal in population as may be” is given to the legislature. Allocation of senators among the counties follows the existing scheme of districting and apportionment, except that one sparsely populated county is detached from populous Arapahoe County and joined with four others in forming a senatorial district, and one additional senator is apportioned to each of the counties of Adams, Arapahoe, Boulder and Jefferson. Within counties given more than one Senate seat, senatorial districts are to be established by the legislature “as nearly equal in population as may be.” [13] Amendment No. 7 also pro *859 vides for a revision of representative districts, and of senatorial districts within counties given more than one Senate seat, after each federal census, in order to maintain conformity with the prescribed requirements.[14] Pursuant to this constitutional mandate, the Colorado Legislature, in early 1963, enacted a statute establishing 66 representative districts and creating senatorial districts in counties given more than one Senate seat.[15] Under the newly adopted House apportionment plan, districts in which about 45.1% of the State’s total population reside are represented by a majority of the members of that body. The maximum population-variance ratio, between the most populous and least populous House districts, is approximately 1.7-to-l. The court below concluded that the House was apportioned as nearly on a population basis as was practicable, consistent with Amendment No. 7’s requirement that “[n]o part of one county shall be added to another county or part of another county” in the formation of a legislative district, and directed its concern solely to the question of whether the *860 deviations from a population basis in the apportionment of Senate seats were rationally justifiable.[16]
Senatorial apportionment, under Amendment No. 7, involves little more than adding four new Senate seats and distributing them to four populous counties in the Denver area, and in substance perpetuates the existing senatorial apportionment scheme.[17] Counties containing only 33.2% of the State’s total population elect a majority of the 39-member Senate under the provisions of Amendment No. 7. Las Animas County, with a 1960 population of only 19,983, is given one Senate seat, while El Paso County, with 143,742 persons, is allotted only two Senate seats. Thus, the maximum population-variance ratio, under the revised senatorial apportionment, is about 3.6-to-l.[18] Denver and the three adjacent subur *861 ban counties contain about one-half of the State’s total 1960 population of 1,753,947, but are given only 14 out of 39 senators. The Denver, Pueblo, and Colorado Springs metropolitan areas, containing 1,191,832 persons, about 68%, or over two-thirds of Colorado’s population, elect only 20 of the State’s 39 senators, barely a majority. The average population of Denver’s eight senatorial districts, under Amendment No. 7, is 61,736, while the five least populous districts contain less than 22,000 persons each. Divergences from population-based representation in the Senate are growing continually wider, since the underrepresented districts in the Denver, Pueblo, and Colorado Springs metropolitan areas are rapidly gaining in population, while many of the overrepresented rural districts have tended to decline in population continuously in recent years.[19]
*862 III.
Several aspects of this case serve to distinguish it from the other cases involving state legislative apportionment also decided this date. Initially, one house of the Colorado Legislature is at least arguably apportioned substantially on a population basis under Amendment No. 7 and the implementing statutory provisions. Under the apportionment schemes challenged in the other cases, on the other hand, clearly neither of the houses in any of the state legislatures is apportioned sufficiently on a population basis so as to be constitutionally sustainable. Additionally, the Colorado scheme of legislative apportionment here attacked is one adopted by a majority vote of the Colorado electorate almost contemporaneously with the District Court's decision on the merits in this litigation. Thus, the plan at issue did not result from prolonged legislative inaction. How.ever, the Colorado General Assembly, in spite of the state constitutional mandate for periodic reapportionment, has enacted only one effective legislative apportionment measure in the past 50 years.[20]
*863 As appellees have correctly pointed out, a majority of the voters in every county of the State voted in favor of the apportionment scheme embodied in Amendment No. 7’s provisions, in preference to that contained in proposed Amendment No. 8, which, subject to minor deviations, would have based the apportionment of seats in both houses on a population basis. However, the choice presented to the Colorado electorate, in voting on these two proposed constitutional amendments, was hardly as clear-cut as the court below regarded it. One of the most undesirable features of the existing apportionment scheme was the requirement that, in counties given more than one seat in either or both of the houses of the General Assembly, all legislators must be elected at large from the county as a whole. Thus, under the existing plan, each Denver voter was required to vote for eight senators and 17 representatives. Ballots were long and cumbersome, and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies within the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them. Rather, each legislator elected from a multimember county represented the county as a whole.[21] Amendment No. 8, as distinguished from Amendment No. 7, while purportedly basing the apportionment of *864 seats in both houses on a population basis, would have perpetuated, for all practical purposes, this debatable feature of the existing scheme. Under Amendment No. 8, senators were to be elected at large in those counties given more than one Senate seat, and no provision was made for subdistricting within such counties for the purpose of electing senators. Representatives were also to be elected at large in multimember counties pursuant to the provisions of Amendment No. 8, at least initially, although subdistricting for the purpose of electing House members was permitted if the voters of a multimember county specifically approved a representative subdistrict-ing plan for that county. Thus, neither of the proposed plans was, in all probability, wholly acceptable to the voters in the populous counties, and the assumption of the court below that the Colorado voters made a definitive choice between two contrasting alternatives and indicated that “minority process in the Senate is what they want” does not appear to be factually justifiable.
Finally, this case differs from the others decided this date in that the initiative device provides a practicable political remedy to obtain relief against alleged legislative malapportionment in Colorado.[22] An initiated *865 measure proposing a constitutional amendment or a statutory enactment is entitled to be placed on the ballot if the signatures of 8% of those voting for the Secretary of State in the last election are obtained. No geographical distribution of petition signers is required. Initiative and referendum has been frequently utilized throughout Colorado’s history.[23] Additionally, Colorado courts have traditionally not been hesitant about adjudicating controversies relating to legislative apportionment.[24] How *866 ever, the Colorado Supreme Court, in its 1962 decision discussed previously in this opinion,[25] refused to consider or pass upon the federal constitutional questions, but instead held only that the Colorado General Assembly was not required to enact a reapportionment statute until the following legislative session.[26]
IV.
In Reynolds v. Sims, ante, p. 533, decided also this date, we held that the Equal Protection Clause requires that both houses of a bicameral state legislature must be apportioned substantially on a population basis. Of course, the court below assumed, and the parties apparently conceded, that the Colorado House of Representatives, under the statutory provisions enacted by the Colorado Legislature in early 1963 pursuant to Amendment No. 7’s dictate that the legislature should create 65 House districts “as nearly equal in population as may be,” is now apportioned sufficiently on a population basis to comport with federal constitutional requisites. We need not pass on this question, since the apportionment of Senate seats, under Amendment No. 7, clearly involves departures from population-based representation too *867 extreme to be constitutionally permissible, and there is no indication that the apportionment of the two houses of the Colorado General Assembly, pursuant to the 1962 constitutional amendment, is severable.[27] We therefore conclude that the District Court erred in holding the legislative apportionment plan embodied in Amendment No. 7 to be constitutionally valid. Under neither Amendment No. 7’s plan, nor, of course, the previous statutory scheme, is the overall legislative representation in the two houses of the Colorado Legislature sufficiently grounded on population to be constitutionally sustainable under the Equal Protection Clause.[28]
*868 Except as an interim remedial procedure justifying a court in staying its hand temporarily, we find no significance in the fact that a non judicial, political remedy may be available for the effectuation of asserted rights to equal representation in a state legislature. Courts sit to adjudicate controversies involving alleged denials of constitutional rights. While a court sitting as a court of equity might be justified in temporarily refraining from the issuance of injunctive relief in an apportionment case in order to allow for resort to an available political remedy, such as initiative and referendum, individual constitutional rights cannot be deprived, or denied judicial effectuation, because of the existence of a non judicial remedy through which relief against the alleged malapportionment, which the individual voters seek, might be achieved. An individual’s constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State’s electorate, if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause. Manifestly, the fact that an apportionment plan is adopted in a popular referendum is insufficient to sustain its constitutionality or to induce a court of equity to refuse to act. As stated by this Court in West Virginia State Bd. of Educ. v. Barnette, 319 U. S. 624, 638, “One’s right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.” [29] A citizen’s constitutional rights can hardly be infringed simply because a majority *869 of the people choose that it be.[30] We hold that the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause, as delineated in our opinion in Reynolds v. Sims. And we conclude that the fact that a practicably available political remedy, such as initiative and referendum, exists under state law provides justification only for a court of equity to stay its hand temporarily while recourse to such a remedial device is attempted or while proposed initiated measures relating to legislative apportionment are pending and will be submitted to the State’s voters at the next election.
*870 Because of the imminence of the November 1962 election, and the fact that two initiated proposals relating to legislative apportionment would be voted on by the State’s electorate at that election, the District Court properly stayed its hand and permitted the 1962 election of legislators to be conducted pursuant to the existing statutory scheme. But appellees’ argument, accepted by the court below, that the apportionment of the Colorado Senate, under Amendment No. 7, is rational because it takes into account a variety of geographical, historical, topographic and economic considerations fails to provide an adequate justification for the substantial disparities from population-based representation in the allocation of Senate seats to the disfavored populous areas.[31] And any attempted reliance on the so-called federal analogy is factually as well as constitutionally without merit.[32]
*871 Since the apportionment of seats in the Colorado Legislature, under the provisions of Amendment No. 7, fails to comport with the requirements of the Equal Protection Clause, the decision below must be reversed. Beyond what we said in our opinion in Reynolds,[33] we express no view on questions relating to remedies at the present time. On remand, the District Court must now determine whether the imminence of the 1964 primary and general elections requires that utilization of the apportionment scheme contained in the constitutional amendment be permitted, for purposes of those elections, or whether the circumstances in Colorado are such that appellants' right to cast adequately weighted votes for members of the State Legislature can practicably be effectuated in 1964.. Accordingly, we reverse the decision of the court below and remand the case for further proceedings consistent with the views stated here and in our opinion in Reynolds v. Sims.

It is so ordered.

APPENDIX TO OPINION OF THE COURT.
Amendment No. 7, approved by a vote of the Colorado electorate in November 1962, appears in Colo. Laws 1963, c. 312, p. 1045 et seq., and, in relevant part, provides as follows:
“Sections 45, 46, and 47 of Article V of the Constitution of the State of Colorado are hereby repealed *872 and new Sections 45, 46, 47 and 48 of Article V are adopted, to read as follows:
“Section 45. GENERAL ASSEMBLY. The general assembly shall consist of 39 members of the senate and 65 members of the house, one to be elected from each senatorial and representative district. Districts of the same house shall not overlap. All districts shall be as compact as may be and shall consist of contiguous whole general election precincts. No part of one county shall be added to another county or part of another county in forming a district. When a district includes two or more counties they shall be contiguous.
“Section 46. HOUSE OF REPRESENTATIVES. The state shall be divided into 65 representative districts which shall be as nearly equal in population as may be.
“Section 47. SENATE. The state shall be divided into 39 senatorial districts. The apportionment of senators among the counties shall be the same as now provided by 63-1-3 of Colorado Revised Statutes 1953, which shall not be repealed or amended other than in numbering districts, except that the counties of Cheyenne, Elbert, Kiowa, Kit Carson and Lincoln shall form one district, and one additional senator is hereby apportioned to each of the counties of Adams, Arapahoe, Boulder and Jefferson. Within a county to which there is apportioned more than one senator, senatorial districts shall be as nearly equal in population as may be.
“Section 48. REVISION OF DISTRICTS. At the regular session of the general assembly of 1963 and each regular session next following official publication of each Federal enumeration of the population of the state, the general assembly shall immediately alter and amend the boundaries of all *873 representative districts and of those senatorial districts within any county to which there is apportioned more than one senator to conform to the requirements of Sections 45, 46 and 47 of this Article Y. After 45 days from the beginning of each such regular session, no member of the general assembly shall be entitled to or earn any compensation or receive any payments on account of salary or expenses, and the members of any general assembly shall be ineligible for election to succeed themselves in office, until such revisions have been made. Until the completion of the terms of the representatives elected at the general election held in November of 1962 shall have expired, the apportionment of senators and representatives and the senatorial and representative districts of the general assembly shall be as provided by law.”
[For dissenting opinion of Mr. Justice Harlan, see ante, p. 589.]

 Colo. Rev. Stat. 1953, c. 63, §§ 63-1-1 — 63-1-6.

 The District Court wisely refrained from acting at all until a case pending in the Colorado Supreme Court was decided without that court’s passing on the federal constitutional questions relating to Colorado’s scheme of legislative apportionment which were raised in that suit. In re Legislative Reapportionment, 150 Colo. 380, 374 P. 2d 66 (1962). After accepting jurisdiction, the Colorado Supreme Court, over a vigorous dissent, ignored the federal constitutional issues and instead discussed only the matter of when the Colorado Legislature was required, pursuant to the State Constitution, to reapportion seats in the General Assembly. The Court concluded that a reapportionment measure enacted during the 1963 session of the Colorado Legislature, on the basis of 1960 census figures, would, if neither of the proposed constitutional amendments relating to legislative apportionment was approved by the voters in November 1962, be in sufficient compliance with the constitutional requirement of periodic legislative reapportionment. See also 208 F. Supp., at 474, discussing the Colorado Supreme Court’s decision in that case.

 In its initial opinion, the District Court properly concluded that the argument that “the Colorado Supreme Court has preempted jurisdiction by first hearing the controversy, is without merit in view of the fact that the Supreme Court of Colorado has refrained from even considering the issue of infringement of the plaintiffs’ federally-guaranteed constitutional rights.” 208 F. Supp., at 475. Continuing, the court below correctly held that, under the circumstances, it was not required to abstain, and stated:
“The considerations which demand abstinence are not present in the instant case. Here, the General Assembly of the State of Colorado *849 has repeatedly refused to perform the mandate imposed by the Colorado Constitution to apportion the legislature. The likelihood that the unapportioned General Assembly will ever apportion itself now appears remote. The Supreme Court of Colorado, while retaining jurisdiction of the subject matter of the controversy presented to it, has postponed further consideration of the cause until June, 1963. Under these circumstances, we must conclude that the parties do not, at least at present, have an adequate, speedy and complete remedy apart from that asserted in the case at bar and thus grounds for abstention are at this time lacking.” 208 F. Supp., at 476. See also Davis v. Mann, ante, pp. 690-691, decided also this date, where we discussed the question of abstention by a federal court in a state legislative apportionment controversy.

 As stated succinctly by the District Court, in its opinion on the merits,
“The defeated Amendment No. 8 proposed a three-man commission to apportion the legislature periodically. The commission was to have *850 the duty of delineating, revising and adjusting senatorial and representative districts. Its actions were to be reviewed by the Colorado Supreme Court. The districting was to be on a strict population ratio for both the Senate and the House with limited permissible variations therefrom.” 219 F. Supp., at 925.
Additionally, under proposed Amendment No. 8, the commission would determine a strict population ratio for both the Senate and the House by dividing the State’s total population, as ascertained in each decennial federal census, by the number of seats assigned to the Senate and the House, respectively. No legislative district should contain a population per senator or representative of 33Ys% more or less than the strict population ratio, except certain mountainous senatorial districts of more than 5,500 square miles in area, but no senatorial district was to contain a population of less than 50% of the strict population ratio. Senatorial districts should consist of one county or two or more contiguous counties, but no county should be divided in the formation of a senatorial district. Representative districts should consist of one county or two or more contiguous counties. Any county apportioned two or more representatives could be divided into representative subdistricts, but only after a majority of the voters in the county had approved, in a general election, the exact method of subdivision and the specific apportionment of representatives among the subdistricts and the county at large. A proposal to divide a county into subdistricts could be placed on the ballot only by initiative petition in accordance with state law, and only at the general elections in 1966 and 1974, and at the general elections held each 10 years thereafter. Amendment No. 8, like Amendment No. 7, would have required implementing legislation and would not have become effective, if adopted, until the 1964 elections.

 219 F. Supp., at 932.

 Ibid. Continuing, the court below stated:
“The initiative gives the people of a state no power to adopt a constitutional amendment which violates the Federal Constitution. Amendment No. 7 is not valid just because the people voted for it. . . . [But] the traditional and recognized criteria of equal protection . . . are arbitrariness, discrimination, and lack of rationality. The actions of the electorate are material to the application of the criteria. The contention that the voters have discriminated against themselves appalls rather than convinces. Difficult as it may be at times to understand mass behavior of human beings, a proper recognition of the judicial function precludes a court from holding that the free choice of the voters between two conflicting theories of apportionment is irrational or the result arbitrary.
“The electorate of every county from which the plaintiffs come preferred Amendment No. 7. In the circumstances it is difficult to comprehend how the plaintiffs can sue to vindicate a public right. At the most they present a political issue which they lost. On the questions before us we shall not substitute any views which we may have for the decision of the electorate. . . . [W]e decline to act as a superelectorate to weigh the rationality of a method of legislative apportionment adopted by a decisive vote of the people.” Id., at 932-933.
And, earlier in its opinion on the merits, the District Court stated: “With full operation of the one-man, one-vote principle, the Colorado electorate by an overwhelming majority approved a constitutional *853 amendment creating a Senate, the membership of which is not apportioned on a strict population basis. By majority process the voters have said that minority process in the Senate is what they want. A rejection of their choice is a denial of the will of the majority. If the majority becomes dissatisfied with that which it has created, it can make a change at an election in which each vote counts the same as every other vote.” Id., at 926-927.

 Id., at 933.

 Additionally, Judge Doyle correctly stated that “a properly apportioned state legislative body must at least approximate by bona fide attempt the creation of districts substantially related to population.” 219 F. Supp., at 941. With respect to the relatively easy availability of the initiative procedure in Colorado, the dissent perceptively pointed out that “it is of little consolation to an individual voter who is being deprived of his rights that he can start a popular movement to change the Constitution. This possible remedy is not merely questionable, it is for practical purposes impossible.” Id,., at 942. Judge Doyle referred to Amendment No. 7’s provisions relating to senatorial apportionment as “the product of a mechanical and arbitrary freezing accomplished by adoption, with slight modification, of the unlawful alignments which had existed in the previous statute.” Id., at 943. Discussing the majority’s view that geographic and economic considerations were relevant in explaining the disparities from population-based senatorial representation, he discerningly stated that geographic and area factors carry "little weight when considered in the light of modern methods of electronic communication, modern highways, automobiles and airplanes,” and, with regard to economic considerations, that “[e]conomic interests are remarkably well represented without special representation,” that “[i]t is dangerous to build into a political system a favored position for a segment of the population of the state,” that “[t]here exists no practical method of ridding ourselves of them,” and that, “long after the institutions pass, the built-in advantage remains even though it is at last only a vestige of the dead past.” Ibid.

 Admittedly, the Colorado Legislature has never complied with the state constitutional provision requiring the conducting of a decennial state census in 1885 and every 10 years thereafter, and of course has never reapportioned seats in the legislature based upon such a *856 census. Under Amendment No. 7, sole reliance is placed on the federal census, and there is no longer any requirement for the conducting of a decennial state census.
In its initial opinion, the District Court stated that there had been only a "modicum of apportionment, either real or purported,” as well as “several abortive attempts,” since Colorado first achieved statehood. However, in its later opinion on the merits, the court below viewed the situation rather differently, and stated that “Apportionment of the Colorado legislature has not remained static.” As indicated by the District Court, in addition to the reapportion-ments which were effected, “[i]n 1954 the voters rejected a referred apportionment measure and in 1956 rejected an initiated constitutional amendment proposing the reapportionment of both chambers of the legislature on a straight population basis.” 219 F. Supp., at 930.

 Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757 (1934). See note 24, infra.

 208 F. Supp., at 474, 475.

 Amendment No. 7 is set out as Appendix A to the District Court's opinion on the merits, 219 F. Supp., at 933-934, and provides for the repeal of the existing Art. Y, §§ 45, 46 and 47, and the adoption of “new Sections 45, 46, 47 and 48 of Article V,” which are set out verbatim in the Appendix to this opinion.
Additionally, the provisions of proposed Amendment No. 8, rejected by the Colorado electorate, are set out as Appendix B to the District Court’s opinion on the merits. 219 F. Supp., at 934-935. See the discussion of Amendment No. 8’s provisions in note 4, supra.

 In addition to establishing House districts, the legislation enacted by the Colorado General Assembly in early 1963, in implementation of Amendment No. 7’s provisions, also divided counties apportioned more than one Senate seat into single-member districts. Amendment No. 7, in contrast to Amendment No. 8, explicitly provided for dis-tricting, with respect to both Senate and House seats, in multimem- *859 ber counties. The rejected amendment, on the other hand, made no provision at all for districting within counties given more than one Senate seat, and allowed subdistricting of House seats only upon specific approval of such a plan by a county’s voters. Thus, Amendment No. 8 would at least in part have perpetuated the extremely objectionable feature of the existing apportionment scheme, under which legislators in multimember counties were elected at large from the county as a whole.

 As stated by the District Court, “Mandatory provisions [of Amendment No. 7] require the revision of representative districts and of senatorial districts within counties apportioned more than one senator after each Federal Census.” 219 F. Supp., at 925. Under the provisions of Amendment No. 7, eight counties are given more than one Senate seat, and 14 of the 39 senatorial districts are comprised of more than one county.

 Colo. Laws 1963, c. 143, pp. 520-532, refefred to as House Bill No. 65.

 As stated by the court below, “The Colorado legislature met in January, 1963, and passed a statute, H. B. No. 65, implementing Amendment No. 7. No question is raised concerning the implementing legislation.” 219 F. Supp., at 92-4-925. Again the District Court stated: “The cases now before the court do not present the issues as they existed prior to the apportionment made by Amendment No. 7. . . . [T]he then-existing disparities in each chamber were severe, the defendants presented no evidence to sustain the rationality of the apportionment, and witnesses for the intervenors, while defending the apportionment of the Senate, recognized the malapportionment of the House. The change by Amendment No. 7 was such as to require a trial de novo and we are concerned with the facts as finally presented.” Id., at 928.

 Appendix C to the District Court’s opinion on the merits contains a chart of the senatorial districts created under Amendment No. 7’s provisions, showing the population of and the counties included in each. 219 F. Supp., at 935-938.

 Included as Appendix D to the District Court’s opinion on the merits is a chart showing the ratios of population per senator in each district to the population of the least populous senatorial district, as established by Amendment No. 7 and the implementing statutory provisions dividing counties given more than one Senate seat into separate senatorial districts. 219 F. Supp., at 939.

 Appellants have repeatedly asserted that equality of population among districts has been the traditional basis of legislative apportionment in both houses of the Colorado General Assembly. They pointed out that both houses of the territorial legislature established by Congress in the organic act creating the territory of Colorado in 1861 were expressly required to be apportioned on a population basis. And, they contended, the legislative districts established for the apportionment of the 26 Senate and 49 House seats in the first General Assembly after Colorado became a State were virtually all substantially equal in population. Referring to the language of the Colorado Supreme Court in Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757 (1934), they urged that no basis other than population has ever been recognized for apportioning representation in either house of the Colorado Legislature. Appellees, on the other hand, have consistently contended that population “ratio” figures have been used in apportioning seats in both houses since 1881, requiring proportionately more population to obtain additional legislative representation. Since the Colorado Supreme Court’s statements in Armstrong regarding population as the basis of legislative representation plainly assumed the existence of an underlying population ratio scheme, its language can hardly be read out of context to support the proposition that absolute equality of population among districts has been the *862 historical basis of legislative apportionment in Colorado. For a short discussion of legislative apportionment in Colorado, including the adoption of Amendment No. 7 and the instant litigation, see Note, 35 IT. of Colo. L. Rev. 431 (1963).

 In 1953 the Colorado General Assembly enacted the legislative apportionment scheme in effect when this litigation was commenced. Prior to 1953, the last effective apportionment of legislative representation by the General Assembly itself was accomplished in 1913. The 1932 measure was an initiated act, adopted by a vote of the Colorado electorate. Although the legislature enacted a statutory plan in 1933, in an attempt to nullify the effect of the 1932 initiated act, that measure was held invalid and unconstitutional, as a matter of state law, by the Colorado Supreme Court. See note 24, infra. And the 1962 adoption of the apportionment scheme contained in proposed constitutional Amendment No. 7 resulted, of course, not from legislative action, but from a vote of the Colorado electorate *863 approving the initiated measure. The 1963 statutory provisions were enacted by the General Assembly simply in order to comply with Amendment No. 7’s mandate for legislative implementation.

 We do not intimate that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective. Rather, we merely point out that there are certain aspects of electing legislators at large from a county as a whole that might well make the adoption of such a scheme undesirable to many voters residing in multimember counties.

 Article V, § 1, of the Colorado Constitution provides that “the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly . . . ,” and further establishes the specific procedures for initiating proposed constitutional amendments or legislation.
Twenty-one States make some provision for popular initiative. Fourteen States provide for the amendment of state constitutional provisions through the process of initiative and referendum. See The Book of the States 1962-1963, 14. Seven States allow the use of popular initiative for the passage of legislation but not constitutional amendments. Both types of initiative and referendum may, of course, be relevant to legislative reapportionment. See Report of Advisory Commission on Intergovernmental Relations, Apportionment of State *865 Legislatures 57 (1962). In some States the initiative process is ineffective and cumbersome, while in others, such as Colorado, it is a practicable and frequently utilized device.
In addition to the initiative device, Art. V, § 1, of the Colorado Constitution provides that, upon the timely filing of a petition signed by 5% of the State’s voters or at the instance of the legislature, the Colorado electorate reserves the power of voting upon legislative enactments in a statewide referendum at the next general election.

 Amendment of the Colorado Constitution can be accomplished, in addition to resort to the initiative and referendum device, through a majority vote of the electorate on an amendment proposed by the General Assembly following a favorable vote thereon “by two-thirds of all the members elected to each house” of the Colorado Legislature, pursuant to Art. XIX, § 2, of the Colorado Constitution. Additionally, a constitutional convention can be convened, upon the favorable recommendation of two-thirds of the members elected to each house of the General Assembly, if the electorate approves of the calling of such a convention to “revise, alter and amend” the State Constitution, under Art. XIX, § 1, of the Colorado Constitution. Pursuant to Art. XIX, § 1, “[t]he number of members of the convention shall be twice that of the senate and they shall be elected in the same manner, at the same places, and in the same districts.”

 See Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757 (1934), where the Colorado Supreme Court held that a 1933 statute, enacted by the legislature to effectively nullify the 1932 initiated act reapportioning legislative representation, was void under the state constitutional provisions. In finding the legislative measure invalid, the' Colorado court stated that “redistricting must be done with due regard to the requirement that representation in the general assembly shall be based upon population,” and that “[t]he legislative act in *866 question is void because it violates section 45 of article 5 of the Constitution, which requires the reapportionment to be made on the basis of population, as disclosed by the census, and according to ratios to be fixed by law.” Stating that “[i]t is clear that ratios, after having been fixed under section 45, . . . cannot be changed until after the next census,” the Colorado Supreme Court concluded that “[t]he legislative act attempts to confer upon some districts a representation that is greater, and upon others a representation that is less, than they are entitled to under the Constitution.” Id., at 428, 37 P. 2d, at 758.

 See note 2, supra.

 In re Legislative Reapportionment, 150 Colo. 380, 374 P. 2d 66 (1962). Even so, the Colorado court stated that “it is abundantly clear that this court has jurisdiction . . . .” Id., at 385, 374 P. 2d, at 69. See note 2, supra.

 See Maryland Committee for Fair Representation v. Tawes, ante, p. 673, decided also this date, where we discussed the need for considering the apportionment of seats in both houses of a bicameral state legislature in evaluating the constitutionality of a state legislative apportionment scheme, regardless of what matters were raised by the parties and decided by the court below. Consistent with this approach, in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State’s legislative apportionment scheme as a whole. Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites of the Equal Protection Clause. Deviations from a strict population basis, so long as rationally justifiable, may be utilized to balance a slight overrepresentation of a particular area in one house with a minor underrepresentation of that area in the other house. But, on the other hand, disparities from population-based representation, though minor, may be cumulative instead of offsetting where the same areas are disadvantaged in both houses of a state legislature, and may therefore render the apportionment scheme at least constitutionally suspect. Of course, the court below can properly take into consideration the present apportionment of seats in the House in determining what steps must be taken in order to achieve a plan of legislative apportionment in Colorado that sufficiently comports with federal constitutional requirements.

 See Reynolds v. Sims, ante, p. 576, where we discussed some of the underlying reasons for our conclusion that the Equal Pro- *868 teetion Clause requires that seats in both houses of a state legislature must be apportioned substantially on a population basis in order to comport with federal constitutional requisites.

 And, as stated by the court in Hall v. St. Helena Parish School Bd., 197 F. Supp. 649, 659 (D. C. E. D. La. 1961), aff’d, 368 U. S. 515, “No plebiscite can legalize an unjust discrimination.”

 In refuting the majority’s reliance on the fact that Amendment No. 7 had been adopted by a vote of the Colorado electorate, Judge Doyle, in dissenting below, stated:'
“The protection of constitutional rights is not to be approached either pragmatically or expediently, and though the fact of enactment of a constitutional provision by heavy vote of the electorate produces pause and generates restraint we can not, true to our oath, uphold such legislation in the face of palpable infringement of rights. Thus, state racial legislation would unquestionably enjoy overwhelming electorate approval in certain of our states, yet no one would argue that this factor could compensate for manifest inequality. It is too clear for argument that constitutional law is not a matter of majority, vote. Indeed, the entire philosophy of the Fourteenth Amendment teaches that it is personal rights which are to be protected against the will of the majority. The rights which are here asserted are the rights of the individual plaintiffs to have their votes counted equally with those of other voters. . . . [T]o say that a majority of the voters today indicate a desire to be governed by a minority, is to avoid the issue which this court is asked to resolve. It is no answer to say that the approval of the. polling place necessarily evidences a rational plan. The plaintiffs have a right to expect that the cause will be determined in relation to the standards of equal protection. Utilization of other or different standards denies them full measure of justice.” 219 F. Supp., at 944.

 In its opinion on the merits, the District Court stated: “By the admission of states into the Union with constitutions creating bicameral legislatures, membership to which is not apportioned on a population basis, Congress has rejected the principle of equal representation as a constitutional requirement.” 219 F. Supp., at 927-928. For the reasons stated in our opinion in Reynolds v. Sims, ante, p. 582, we find this argument unpersuasive as a justification for the deviations from population in the apportionment of seats in the Colorado Senate under the provisions of Amendment No. 7. Also, the court below stated that the disparities from population-based senatorial representation were necessary in order to protect “insular minorities” and to accord recognition to “the state’s heterogeneous characteristics.” Such rationales are, of course, insufficient to justify the substantial deviations from population in the apportionment of seats in the Colorado Senate under Amendment No. 7, under the views stated in our opinion in Reynolds.

 See Reynolds v. Sims, ante, pp. 571-576, discussing and rejecting the applicability of the so-called federal analogy to state legislative apportionment matters. As stated in the dissent below, “It would appear that there is no logical basis for distinguishing between the lower and the upper house — that the equal protection clause applies to both since no valid analogy can be drawn between the United States Congress” and state legislatures. 219 F. Supp., *871 at 940-941. Additionally, the apportionment' scheme embodied in the provisions of Amendment No. 7 differs significantly from the plan for allocating congressional representation among the States. Although the Colorado House of Representatives is arguably apportioned on a population basis, and therefore resembles the Federal House, senatorial seats are not apportioned to cpunties or political subdivisions in a manner that at all compares with the allocation of two seats in the Federal Senate to each State.

 See Reynolds v. Sims, ante, p. 585.