**Sadie L. COHEN et al., Plaintiffs,**

v.

**Thomas C. MALONEY, Mayor of the City of Wilmington, et al., Defendants.**

**Civ. A. No. 4736.**

United States District Court, D. Delaware.

March 3, 1976.

G. Thomas Sandbach, Biggs & Battaglia, Wilmington, Del., for plaintiffs.

Michael P. Maguire and Robert D. Goldberg, Asst. City Sols., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

Plaintiffs in this suit challenge Ordinance 73–074[1] of the City of Wilmington which amended the City's apportionment plan in 1973 by transferring the entire population of a 15-block election district from the Eighth Councilmanic District to the Second Councilmanic District, thereby allegedly diluting the votes of residents of the Second Councilmanic District and of the transferred election district. Plaintiffs fall into two groups, those who reside in the transferred election district and those who reside in the area which constituted the Second Councilmanic District prior to the 1973 re-apportionment. Defendants are the Mayor, members of the City Council, members of the Department of Elections of New Castle County, and the state Election Commissioner.

This case was before the Court on a prior occasion on plaintiffs' motion for summary judgment. At that time the Court declined to grant summary judgment in light of defendants' contentions that the undisputed 18.3% deviation between the least and most populous councilmanic districts[2] could be justified by considerations of history and geography. The Court thought it inadvisable to decide the question of the constitutionality of the City's apportionment plan on the basis of the scanty record it then had before it.

On the basis of all of the evidence developed at trial, the Court concludes that the 18.3% deviation violates the one man-one vote principle of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The defendants will be enjoined from electing any city councilmen in the November 1976 elections pursuant to the provisions of Ordinance 73–074.

The legislative power of the City of Wilmington is vested in the Council of the City of Wilmington by virtue of the provisions of Section 1–102 of the Charter of the City of Wilmington. Under the provisions of Section 2–100 of that Charter, the Council consists of 12 members, of whom eight are selected from councilmanic districts and four from the city at large, and the president of the Council, who is elected by the people

---

1. Enacted on September 6, 1973.

2. Expressed as a percentage of the average or ideal district.

from the city at large. Under Section 2–102 of the Charter, the eight councilmanic districts must contain "as nearly as practicable" an equal population distribution.

On July 12, 1971, the Council of the City of Wilmington enacted Ordinance 71–052, creating eight councilmanic districts in the city. This Ordinance was later amended by Substitute 1 to Ordinance 71–055, correcting certain technical errors in that Ordinance. These ordinances, taken together, constituted the apportionment under which members of the City Council were elected during the general election held in November of 1972. The population of each of the aforesaid councilmanic districts was as follows:

| | |
|---|---|
| First Councilmanic District: | 9,902 |
| Second Councilmanic District: | 10,145 |
| Third Councilmanic District: | 10,009 |
| Fourth Councilmanic District: | 9,782 |
| Fifth Councilmanic District: | 10,284 |
| Sixth Councilmanic District: | 10,299 |
| Seventh Councilmanic District: | 9,848 |
| Eighth Councilmanic District: | 10,117 |

As a result of this apportionment, the deviation in population between the largest and smallest district, expressed as a percentage of the average or ideal district, was 5.15%.

At the same meeting on July 12, 1971, the Council, by a vote of 10 to 3, defeated an ordinance which would have re-apportioned the City into eight districts but would have maintained the area which is now the Second Election District of the Sixth Councilmanic District, the area in dispute, in a council district north of the Brandywine River. The population deviation which would have resulted from the adoption of this plan would have been less than 5.15%.

On September 6, 1973, the Council enacted Ordinance 73–074, which amends the apportionment plan of the City by transferring a portion of the Second Election District of the Sixth Representative District from the Eighth Councilmanic District to the Second Councilmanic District. The portion of the election district that was transferred from one councilmanic district to another contained the entire population of the election district. The portion of the election district which remained in the Eighth Councilmanic District constituted a part of a municipal park known as Brandywine Park. As a result of the passage of this ordinance, the population of the eight councilmanic districts was as follows:

| | |
|---|---|
| First Councilmanic District: | 9,902 |
| Second Councilmanic District: | 11,054 |
| Third Councilmanic District: | 10,009 |
| Fourth Councilmanic District: | 9,782 |
| Fifth Councilmanic District: | 10,284 |
| Sixth Councilmanic District: | 10,299 |
| Seventh Councilmanic District: | 9,848 |
| Eighth Councilmanic District: | 9,208 |

The resulting deviation in population between the largest and smallest councilmanic district, expressed as a percentage of the average or ideal district, is 18.37%.

■ It is firmly established that state and local governments have a duty under the Equal Protection Clause of the United States Constitution to make population the prime criterion in any apportionment of the franchise.[3] *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Voting districts must be as nearly equal in population as is practicable. *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

■ To be sure, mathematical precision is not constitutionally required. *Abate v. Mundt, supra* ; *Reynolds v. Sims, supra.* And recent case law suggests that minor deviations from an ideal population distribution do not make

3. See *infra* at pp. 1152–1153 for discussion of what constitutes the appropriate population measure.

out a prima facie case of equal protection violation, thereby placing no burden on proponents of the apportionment plan to justify the deviations in order to establish the plan's constitutional validity. *Gaffney v. Cummings, supra; White v. Register,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

■ But the 18.3% deviation in the case at bar is far more than a minor deviation from the ideal.[4] A plan containing a deviation of that magnitude will only pass constitutional muster if the deviation can be justified on the basis of "legitimate state considerations." *Abate v. Mundt, supra,* 403 U.S. at 185, 91 S.Ct. at 1906, 29 L.Ed.2d at 402. And the burden of proving that the considerations identified do in fact justify the deviation in question falls squarely on the proponents of the apportionment plan. Cf., *White v. Register, supra,* 412 U.S. at 764, 93 S.Ct. at 2338, 37 L.Ed.2d at 323. See also this Court's prior opinion on the summary judgment question.

■ To meet their burden and establish the constitutionality of the city's apportionment plan under the Equal Protection Clause, the defendants must prove that the deviations in the plan are "based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds v. Sims,* 377 U.S. at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537. This necessarily entails a determination that the considerations dictating the choice of a particular apportionment plan or policy are legitimate or constitutionally acceptable ones.[5] It further entails a determination that there is a rational state policy, that the policy is furthered by the apportionment plan in question, and that the plan, even if justified by a rational state policy, is within tolerable limits. *Mahan v. Howell, supra,* 410 U.S. at 326, 93 S.Ct. at 986, 35 L.Ed.2d at 331; *Abate v. Mundt, supra,* 403 U.S. at 186, 91 S.Ct. at 1907, 29 L.Ed.2d at 403.[6]

■ Demonstrating that there is a rational state policy requires not merely a showing that the asserted policy is rational, but also that a coherent policy does in fact exist. This is not to say that the defendants need prove the legislators' subjective intent to implement the policy at the time they enacted the apportionment plan. It does mean that defendants must prove that the asserted policy has been consistently adhered to by the state or local government in its

---

4. Apparently any deviations below 10% are considered "minor" ones. For example, in *White* a deviation of 9.9% between the least and most populous election districts for the Texas House of Representatives was held presumptively valid. The Court suggested the likelihood, however, that "larger differences between districts would not be tolerable without justification 'based on legitimate considerations incident to the effectuation of a rational state policy,' *Reynolds v. Sims,* 377 U.S., at 579 [84 S.Ct., at 1391]; *Mahan v. Howell, supra* at 325 [93 S.Ct., at 985]. . . ." 412 U.S. at 764, 93 S.Ct. at 2338, 37 L.Ed.2d at 323.

 And in *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Court required precisely such justification to support an 11.9% deviation in the apportionment plan of the County Board of Supervisors for Rockland County, New York.

 In *Mahan,* not only did the Court hold that a 16.4% deviation in the Virginia General Assembly's election districts made out a prima facie equal protection violation, but the Court there said that deviations of that magnitude "[might] well approach tolerable limits." 410 U.S. at 329, 93 S.Ct. at 987, 35 L.Ed.2d at 333. The deviation in the case at bar is even larger than that in *Mahan.*

5. See, for example, *Gaffney v. Cummings, supra,* 412 U.S. at 751, 93 S.Ct. at 2330, 37 L.Ed.2d at 311, citing instances where apportionment plans have been held constitutionally invalid because they were "employed 'to minimize or cancel out the voting strength of racial or political elements of the voting population.' *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)."

6. As noted by the Court in *Mahan v. Howell, supra,* 410 U.S. at 326, 93 S.Ct. at 986, 35 L.Ed.2d at 331:

 [A] State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality.

apportionment scheme. *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Mahan v. Howell, supra.*[7]

■ In evaluating the apportionment plan in light of these factors, the Court must consider the entire plan. *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713 at 735, 84 S.Ct. 1459 at 1473, 12 L.Ed.2d 632 at 646 (1964); Cf., *Chapman v. Meier, supra* 420 U.S. at 23, 95 S.Ct. at 764, 42 L.Ed.2d at 782. At issue here is not simply the effect of Ordinance 73–074 on the particular councilmanic districts whose population configurations were altered. At issue is whether the *total* apportionment plan, in light of the justification offered by defendants for the 18.3% deviation, passes constitutional muster. As the Supreme Court observed in *Lucas v. Forty-Fourth General Assembly*, 377 U.S. 713, 735, 84 S.Ct. 1459, 1473, 12 L.Ed.2d 632, 646 (1964):

> " . . . in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole. Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites of the Equal Protection Clause."

■ Defendants offer three justifications for the 18.3% deviation. First, de-fendants contend that since the amended apportionment plan accomplished only minimal changes in the *voting age* populations of the Second and Eighth Councilmanic Districts,[8] it is not constitutionally infirm. Defendants argue that in enforcing the equal protection clause, courts have been concerned with ensuring that the voting power of each qualified voter is equal to that of every other voter. Consequently, they reason, voting age population is an equally acceptable, if not superior, criterion to be used in assessing the constitutionality of any apportionment of the franchise.

While this Court has some doubt about the propriety of using voting age population in the apportionment process,[9] that issue need not be resolved here. The apportionment of the city accomplished by Ordinance 73–074 is clearly not designed to assure that the voting age population of each councilmanic district is as nearly equal as possible. Following enactment of that Ordinance the maximum deviation of voting age population was *at least* 32.8%, a deviation nearly double the 18.3% deviation which defendants are attempting to justify. The mere fortuity that the transfer of a single election district from one councilmanic district to another did not increase the disparity between the voting age populations of those two districts cannot validate the deviation. As noted above, it is the apportionment plan as a whole which must be evaluated, and that plan was simply not devised with voting age population as the primary population measure.

---

7. While a history of adherence to the policy may not be necessary in all instances, this form of official recognition will vouch for the existence of the policy and its importance, and the absence of past adherence will make the burden of justification more difficult to carry. E. g., *Abate v. Mundt, supra.*

8. The voting age population of the Eighth Councilmanic District was 7788 before the 1973 reapportionment and 7049 after. The voting age population of the Second Councilmanic District was 7081 before the change and 7820 after.

9. The Supreme Court has not defined the precise population bases that may be used to effectuate the one-man, one-vote mandate of the equal protection clause. *Burns v. Richardson, supra; Gaffney v. Cummings, supra.* It appears that citizen population figures, as opposed to total population figures derived from the federal census, are an acceptable measure. See *Burns v. Richardson, supra*, 384 U.S. at 91, 86 S.Ct. at 1296, 16 L.Ed.2d at 390. And, in *Burns*, the Court approved the use of registered voters as the population criterion in apportioning the franchise for Hawaii's Senate and House of Representatives. However, the Court there justified use of registered voters

■ Defendants further contend, by way of justification for the 18.3% deviation, that the apportionment plan was amended in 1973 to more nearly conform the councilmanic districts to homogeneous neighborhood areas. In support of this contention, defendants introduced evidence concerning a division of the city into statistical "neighborhood analysis areas," for use by the city planning office, and testimony of local residents and politicians about the areas served by various civic associations and the types of concerns prevalent among residents of the two councilmanic districts involved. In sum, the defendants maintain that it is permissible for a city council to devise an apportionment plan which attempts to group people of like interests in the same councilmanic district.

I find no support for defendants' contention in the case law.[10] Once again, however, it is unnecessary to pass upon the propriety of the suggested apportionment criterion. The Court is not persuaded that the city's apportionment plan following the adoption of Ordinance 73–074 was designed to serve the policy advanced by way of justification for the

18.3% population deviation. If anything, the evidence at trial suggested a distinct lack of attention to the boundaries of neighborhood analysis areas on the part of drafters of the 1971 apportionment plan and the 1973 amendment to that plan. The Baynard Boulevard neighborhood analysis area, the area which defendants maintain the Council was attempting to keep intact by transferring the second election district to the second councilmanic district, still remained split between two councilmanic districts[11] even after the amendment. And testimony from experts at trial indicated that the portion of the neighborhood analysis area remaining outside the second councilmanic district was no less a part of that community than the portion transferred to the second councilmanic district by the 1973 ordinance. Even more persuasive perhaps is that under the 1971 apportionment plan, of the fifteen other neighborhood analysis areas in the city besides the Baynard Boulevard area, seven were split between two councilmanic districts.[12] Observations of similar import could be made concerning the absence of a correlation between councilmanic districts and

---

on grounds that the results were the same as they would have been if total citizen population had been used as the criterion. Implicit in this holding is the notion that had the population measure employed yielded results significantly different from those which would have been obtained had total census population or citizen population figures been used, then reliance on that different population measure would have been impermissible. As stated by the Court:

> In view of these considerations, we hold that the present apportionment satisfies the Equal Protection Clause *only* because on this record it was found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis. (emphasis added) 384 U.S. at 93, 86 S.Ct. at 1297, 16 L.Ed.2d at 391.

But see, *Martin v. Venables*, 401 F.Supp. 611 (D.Conn.1975).

**10.** It is true that the Supreme Court has approved the use of political subdivision lines as a criterion to justify deviations from an ideal population distribution. *Chapman v. Meier, supra*; *Gaffney v. Cummings, supra*; *Mahan*

*v. Howell, supra*; *Abate v. Mundt, supra*; *Reynolds v. Sims, supra*. In *Abate*, for example, where the County Board of Supervisors had traditionally been composed of the town supervisors of each of the county's five towns, the Court approved an apportionment plan which deviated from the ideal population distribution in order to respect that traditional political configuration. But the Court's decision did not rest on a desire to permit people of like interests to remain in the same election district. Rather, it reflected an unwillingness on the part of the Court to disrupt traditional decision-making mechanisms, worked out over time at the local level, providing those traditional mechanisms did not discriminate against particular individuals or groups of individuals. *Abate v. Mundt, supra* 403 U.S. at 185–186, 91 S.Ct. at 1906–1907, 29 L.Ed.2d at 402–403.

**11.** Between the first and second councilmanic districts.

**12.** The Washington and Market neighborhood analysis area was split between the first and second councilmanic districts; the Price Run area between the first and third districts; the Vandever area between the second and third districts; the Eastside area between the third and fourth districts; the South Hilltop area

the areas served by various civic associations.

This Court finds no discernible policy on the part of the City of Wilmington to conform the boundaries of its councilmanic districts to those of "neighborhood areas". Consequently, even if a deviation could be justified on the basis of respecting the integrity of discrete neighborhood areas, such justification could not be applied to the 18.3% deviation in the case at bar.

 Finally, defendants contend that the Council was entitled to respect the Brandywine River [13] as a natural boundary and, accordingly, it was permissible for it to move the second election district, which is located north of the Brandywine, from a councilmanic district south of the Brandywine [14] to one north of the Brandywine.[15]

There is case law support for the proposition that natural boundaries may sometimes be regarded as a legitimate consideration justifying a particular apportionment plan. *Abate v. Mundt, supra; Reynolds v. Sims, supra; Cf., Chapman v. Meier, supra.*

In some instances, such boundaries may create communication and association barriers of substantial significance in the administration of local government. Some natural boundaries, for example, may dictate a city's approach to the delivery of municipal services and might well be reflected in a rational apportionment scheme under which those responsible for the quality of those services are selected. The facts of this case, however, do not suggest that the Brandywine is a natural boundary which has

traditionally been of significance in the administration of local government. Such evidence as was introduced at trial with respect to police and fire protection, for example, indicated the city does not recognize the Brandywine as a significant factor in its planning.

Moreover, the record indicates no consistent recognition of the Brandywine or a comparable geographic division, the Christina River as apportionment criteria. Quite the contrary, the 1971 apportionment plan did not use the Brandywine Creek or the Christina River as boundary lines for councilmanic districts. Under this plan, other districts besides the eighth—the third, fourth and sixth—contained portions on either side of the Brandywine or the Christina. These same three districts which spanned both sides of the Brandywine or the Christina under the 1971 apportionment plan were left intact by the 1973 ordinance.

Even more persuasive is the fact that at the time the 1971 apportionment plan was enacted, the City Council specifically rejected a plan that would have put the area that was the subject of the 1973 amendment in a councilmanic district north of the Brandywine.

Thus, the city's apportionment plan as it now stands reflects no discernible policy on the part of the city council to rely on waterways as natural boundaries for the councilmanic districts. Consequently, the 18.3% deviation cannot be justified on this basis.

Since none of the considerations put forward by defendants can justify the sizeable deviation created by Ordinance 73–074, the resulting apportionment plan must fall.[16]

Submit Order.

---

between the fifth and seventh districts; the North Hilltop area between the fifth and seventh districts; the West Center City area between the fourth and fifth districts.

13. Referred to as the Brandywine Creek on the official map of the City of Wilmington.

14. The eighth councilmanic district.

15. The second councilmanic district.

16. Plaintiffs also allege that Ordinance 73–074 is unconstitutional in that the amendment to

the apportionment plan was racially and politically motivated. In light of the conclusion reached above that the Ordinance must fall because none of the justifications offered in support of it pass constitutional muster, the Court finds it unnecessary to decide whether concerns such as racial discrimination and the desire to bestow political advantage on particular elective officials did in fact motivate passage of the 1973 Ordinance.