I. William **BIANCHI**, Jr., and Quentin B. Sammis, Plaintiffs,

v.

Evans K. **GRIFFING**, William P. Bain, Lester M. Albertson, William J. Leonard, Stephen F. Meschutt, Ralph J. Flynn, Arthur M. Cromarty and Thomas J. Harwood, constituting the Board of Supervisors of Suffolk County, New York, Defendants.

Civ. A. No. 62-C-821.

United States District Court
E. D. New York.
Feb. 1, 1965.

Frederic Block, Port Jefferson, N. Y., and Cahn & Cahn, Huntington, N. Y., for plaintiffs.

Before MOORE, Circuit Judge, and BRUCHHAUSEN and DOOLING, District Judges.

MOORE, Circuit Judge.

Plaintiffs, I. William Bianchi, Jr., and Quentin B. Sammis, residents of the Towns of Brookhaven and Huntington, Suffolk County, State of New York, bring this action in their own behalf and in behalf of all other taxpayers and voters of Suffolk County, against the ten individual defendants, each of whom is an elected Supervisor of his respective town and who collectively constitute the Board of Supervisors of Suffolk County (1) to declare void and invalid as violative of the Fourteenth Amendment of the United States Constitution so much of Section 203 of the Suffolk County Charter, Laws 1958, c. 278 as provides that each Supervisor shall have one vote as a member of the Suffolk County Board of Supervisors; (2) to enjoin the defendants from acting as the Board of Supervisors unless and until a change in their voting strength is made; and (3) to cause to be convened a three-judge court to hear and determine the case (28 U.S.C. § 2281 et seq.). A motion was made to dismiss the complaint upon the ground, amongst others, that no substantial federal ques-

tion is raised. The motion was denied without prejudice to renewal before a three-judge court, Bianchi v. Griffing, 217 F. Supp. 166 (E.D.N.Y.1963). Thereafter, a three-judge court was convened and a hearing was held, upon which the motion to dismiss was renewed.

Many cases have been pending in the Supreme Court and in other courts arising out of the decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962) but despite the plethora of cases filed and the Supreme Court decisions of June 1964, there has been found no Supreme Court case which overturns the principle announced by that Court that section 2281 does not apply where "although the constitutionality of a statute is challenged, the defendants are local officers and the suit involves matters of interest only to the particular municipality or district involved." Ex parte Collins, 277 U.S. 565, 568, 48 S.Ct. 585, 586, 72 L.Ed. 990 (1928). See also Rorick v. Board of Com'rs, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242 (1949); Ex parte Public Nat'l Bank, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928).

The recent Supreme Court decisions (June 15, 1964) [1] have decided that "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L. Ed.2d 506 (1964); that such apportionment must be "sufficiently on a population basis to be constitutionally sustainable." WMCA, Inc. v. Lomenzo, 377 U. S. 633, 653, 84 S.Ct. 1418, 1428, 12 L.Ed. 2d 568 (1964); and "the fact that an apportionment plan is adopted in a popular referendum is insufficient to sustain its constitutionality or to induce a court of equity to refuse to act." Lucas v. Forty-Fourth General Assembly of State of Colo., 377 U.S. 713, 736, 84 S.Ct. 1459, 1473, 12 L.Ed.2d 632 (1964). The Court found "no significance in the fact that a non-judicial, political remedy [such as initiative and referendum] may be available for the effectuation of asserted rights to equal representation in a state legislature." Ibid. In other words, the fact that "a majority of the people choose to do so," and that a "legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause, as delineated in our opinion in Reynolds v. Sims." Id., 377 U.S. at 737, 84 S.Ct. at 1474.

However, these cases all dealt with the election of state legislative bodies. To date the Court has not had to consider whether the Equal Protection Clause applies as well to the method of electing the officials of hamlets, villages, school, fire, sewerage and water districts, towns, cities or counties, whether, that is, the right to vote is protected by the Equal Protection Clause in its every exercise, or only in some restricted class of definably important voting occasions.

This Suffolk County case does not involve the election of members of the houses of the state legislature. It does attack, however, the provision of the Suffolk County Charter whereby the County Board of Supervisors, which has a local legislative authority, is to consist of the elected Supervisors of each of the county's ten towns.

The basic theory of the action is disparity of representation. Concerning disparity, there can be no question. The ten towns of Suffolk were never of equal population; town lines were not drawn on a population basis and did not profess to be so drawn. In addition, over the years radical population changes as a

1. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); WMCA Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. Forty-Fourth General Assembly of State of Colo., 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

result of economic and industrial developments have taken place in eastern Long Island. The location of large defense plants in this area has brought thousands of families into the westerly towns of Suffolk County. The eastern area remains thinly populated; the western has become rather densely populated. Thus, for example, the town of Shelter Island finds itself about as it was 150 years ago with its population stabilized at some 1,300 persons whereas the towns of Islip, Huntington and Babylon, to take extreme cases, have some 172,000, 126,000 and 142,000 [2] persons, respectively.

Each town has elected its chief executive officer (the supervisor) and no fault can be found with this practice. The trouble arises, so aver the plaintiffs, because the supervisors of the ten towns constitute the Board of Supervisors of the County which is the legislative body of the County. Little mathematical ingenuity is required to prove plaintiffs' thesis that the vote in County management affairs by the Supervisor from Shelter Island is representative of 1,300 persons whereas the equal vote of the supervisor of the town of Islip is representative of over 172,000 persons. The individual vote ratio is over 100 to 1 in favor of Shelter Island and against Islip. If county government within the States must conform to the Equal Protection Clause, as must congressional and legislative districts in the various States, then obviously Baker v. Carr, supra, and the June 1964 cases, supra, call for action. But first there is the fundamental question of how far should the federal judiciary go, or interest itself, in extending Reynolds v. Sims to local governmental bodies in states the legislatures of which are now required to be apportioned on a population basis. The question is not easy to decide. Like so many legal problems, the solution may well be dependent upon degree.

Baker v. Carr and kindred cases presented fairly simple situations. State constitutions providing for a definite system of representation according to numbers were completely ignored. The legislatures which under their own constitutions should have made the changes required flagrantly refused to obey their own constitutional mandates. In view of such refusals, there seemed to be no other alternative than for the courts to assume this function. Thus, at one end of the popular representation spectrum there is the congressional and state district equality-of-vote-doctrine. At the other end could be taken the logical extreme of the election of village trustees from wards of unequal population: it may be doubtful that the federal judiciary would declare the method unconstitutional and forthwith order a general election by the village at large,[3] at least where a re-apportioned legislature exists and change is in the wind.

Between these two extremes lie the many minor governmental units referred to such as fire, water, sewer, school districts, towns, villages and cities. Somewhere in the middle ground falls this Suffolk County case.[4]

Pursuant to its constitutional authority, N.Y. Const., Art. IX, the New York State legislature has given to the counties of the State the right to have a county charter. Such a charter was enacted for Suffolk County and in 1958 (election of November 4, 1958) the people of the county overwhelmingly adopted it. That Charter provides in section 201 for a County Board of Supervisors to consist of the supervisor of each town. By popular approval of the Charter in this form, defendants argue, the people of the county expressed themselves clearly and if there is to be any

2. 1960 census.

3. McMillan v. Wagner, 239 F.Supp. 32 (S.D.N.Y., 1964); Ellis v. Mayor and City Council of Baltimore, 234 F.Supp. 945, (D.Md., 1964).

4. The whole area has been ably and thoroughly discussed by Professor Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Colum.L.Rev. 21 (1965).

vestigial remainder to a government "of the people, by the people and for the people," such a vote should be sufficient proof of the wishes of the voters. But, if Lucas is to apply at all levels of local government and is not to be restricted to state legislative apportionment, voter approval would be of no value. Moreover, it may well be that in voting for the "charter," the voters expressed only their approval of its general "home rule" advantages over the earlier system, or it may be that the voters had no clear conception of the fact that the charter preserved the power of a comparatively small percentage of the county's population to elect a potential majority of the county's legislative body. Had the spotlight of publicity been focused on this latter point, the argument from the vote at the 1958 polls would be more convincing

## I

Defendants by their motion to dismiss raise the question of the power of a three-judge federal court to act in the premises. Assuming justiciability, is this provision of the Suffolk Charter of such statewide interest as to be within the jurisdiction of such a court? Relatedly, is a substantial federal question now presented? And is the case, in any event, ripe for injunctive intervention? The cases which have had to deal with the problem of allegedly unequal representation in local-government elections have by no means given it uniform treatment.

In Tedesco v. Board of Supervisors of Elections, 43 So.2d 514 (C.A.La., 1949), a resident of the Third District of New Orleans complained that approximately one-half the people of the City lived in the Third and Sixth Districts and were represented by only two-sevenths of the Commissioners in whom were vested administrative and executive powers for the City of New Orleans, and that the Louisiana statute producing the result violated the Fourteenth Amendment (United States Constitution). More specifically, the 8,508 voters of the Fifth District elected one Commissioner whereas the voters of the Third District numbering some 48,020 also elected one Commissioner. The court concluded that the statute was not violative of any provision of the Federal Constitution and affirmed the judgment dismissing the suit. An appeal to the Supreme Court was "dismissed for want of a substantial federal question." 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950).

In Michigan [Johnson v. Genesee County, Michigan, etc., 232 F.Supp. 567 (E.D.Mich.1964)], the plaintiffs questioned the validity of a sewer improvement authorized by the affirmative vote of the Board of Supervisors of Genesee County on the ground that the Supervisors so voting represented less than a majority of the population of the county. There were serious imbalances in population representation on the Board, illustrated by one township having some 30,000 inhabitants, another 2,000, yet each having one member on the Board. City representation showed an even wider disparity. The court denied the claim for injunctive relief and dismissed the amended complaint. In the opinion it noted the June 15, 1964, rulings of the Supreme Court and the docketing there of Glass v. Hancock County Election Commission, 156 So.2d 825 (Miss.1963) (appeal dismissed, 378 U.S. 558, 84 S.Ct. 1910, 12 L.Ed.2d 1035 (1964)), in which case the question was raised as to whether the failure to redistrict county supervisor districts, like the failure to reapportion state legislative districts, violated the Fourteenth Amendment where there is population disparity. The Supreme Court of Mississippi had affirmed the denial of injunctive relief on the theory that there was an adequate remedy at law, namely, available statutory procedure for redistricting. The Michigan District Court also considered Griffin v. Board of Supervisors, 60 Cal.2d 318, 33 Cal.Rptr. 101, 384 P.2d 421 (1964), wherein the court ordered the redistricting of the supervisorial districts of the county. In that case, the California state statute required the dis-

tricts to be "as nearly equal in population as may be."

Recently in the United States District Court for the Southern District of New York, a plaintiff (a voter of the City of New York) sued the Mayor and other city officials and the Attorney General and Secretary of State of New York alleging that sections of the New York City Charter (Sections 61 and 62 of Chapter 3) were unconstitutional because the voting power of each member of the Board of Estimate is weighted in favor of the less populated Boroughs. The Board of Estimate, the City's principal legislative body, consists of the Mayor, the Comptroller, and the President of the City Counsel, each of whom has four votes and the Presidents of the five Boroughs each of whom has two votes. There is substantial disparity in the populations of the Boroughs. The convening of a three-judge court was sought pursuant to 28 U.S.C. § 2281. Judge McLean denied the motion and, after pointing out that there was no unconstitutionality about the state statute authorizing the City of New York to have its own Charter, said: "That charter applies only to New York City. It is not a state statute of statewide application. The members of the Board of Estimate are city officials acting as such, not officers of the state. * * * It is clear under the authorities that this case does not fall within Section 2281 and that the action should be tried in the regular way by a single judge, not by a three-judge court." McMillan v. Wagner, 239 F.Supp. 32 (S.D.N.Y.1964).

However, since the Supreme Court's June 15, 1964, decisions, there have been cases extending their principle to lesser units of government than state legislatures. In Michigan (Brouwer v. Bronkema, Circuit Court for the County of Kent, No. 1855, September 11, 1964), Judge Searl had to consider Kent County, the Board of Supervisors[5] of which

consisted of supervisors from 22 townships and 8 cities in the county; the per capita representation of each supervisor was most disproportionate. In a comprehensive and well-reasoned opinion, Judge Searl concluded that despite the enactment of the State's 1963 Constitution, "the Fourteenth Amendment voids the entire Michigan Plan."

On October 21, 1964, in an informal opinion wherein he, in effect, adopted Judge Searl's opinion, Judge Mize (Damon, et al. v. Lauderdale County Election Commissioners, et al., Civil Action No. 1197–E, U.S.D.C.S.D.Miss.) said that, "the Fourteenth Amendment is applicable to redistricting counties as well as the legislatures of the various states."

In Ellis v. Mayor and City Council of Baltimore, 234 F.Supp. 945 (D.Md., 1964), a voter class action, declaratory and injunctive relief was sought on the ground that both the existing and the proposed apportionment of the City Council were invalid. The district court decided that the principles applicable to the apportionment of state legislatures applied to the Baltimore City Council.

Most recently in State ex rel. Sonneborn et al., Relators v. Sylvester, County Clerk of Waukesha County, et al., Respondents, 132 N.W.2d 249, filed January 5, 1965, the Supreme Court of Wisconsin held unconstitutional a provision of its state constitution providing for the composition of boards of supervisors on a town, ward and village basis which resulted in substantial disparities in voter representation. In so holding, the court said, "However, county boards possessing the type of legislative power which they do must be considered a unit of government which should be equally representative of the people of the county." And, "Since the composition of the legislature must conform to the principle of equal representation, it is logical that the arm or political subdivision of such legisla-

5. Section 7 of Article VII of the Michigan Constitution of 1963 reads:
"A board of supervisors shall be established in each organized county consisting of one member from each organized township and such representation [representative] from cities as provided by law."

ture enacting legislation should be governed by the same principle of equal representation."

After the three-judge court in Johnson et al. v. Genesee County, supra, had returned the case to a single judge for decision (232 F.Supp. 563), Judge Roth wrote that "Under the rule of stare decisis [i. e., he had concluded that "Under the prevailing view of the United States Supreme Court, * * * the composition of local units of government is held to be a state matter"], this Court is not free to consider the subject of the apportionment of representation on local legislative bodies." He qualified this pronouncement, however, with the prophecy that, "It may well be that the time will come when the application of the Fourteenth Amendment will be extended that far. The more likely development is that the June 15, 1964, rulings of the Supreme Court in cases dealing with the state legislatures of Alabama, New York, Maryland, Delaware, Virginia and Colorado will result in legislatures in our states which will be proportionately representative of people, and therefore, likely to themselves establish in local legislative bodies a vastly different balance between people and governmental power." 232 F.Supp. at 572.

Probably mindful of such possible curative measures being enacted, Judge Searl (Brouwer v. Bronkema, supra) had said, "Consistent with the course indicated as proper in the Reynolds case, this court will defer any action by injunction or otherwise until the 1965 Legislature has had an opportunity to remedy the deviations from constitutional standards in the present Michigan provisions providing for the membership of the County Board of Supervisors. The court will retain jurisdiction and in the event the Legislature fails to act, after it has had an adequate opportunity to do so, application may be made to this court for an appropriate remedy."

In the Baltimore City Council case (Ellis v. Mayor, etc.), supra, although the court enjoined any election in November 1964 pursuant to certain provisions of the City Charter found to be invalid, it nevertheless said, "We will not undertake a valid reapportionment of the City Council of Baltimore at this time. Under the existing Charter, municipal elections will not again occur until May, 1967. If Resolution No. 1 is adopted, municipal elections will not occur until November, 1967. A general election will be held in November, 1966. There is, therefore, ample time for the City Council to propose a valid scheme of reapportionment and submit it to the voters for adoption before the next municipal election will be held. We will, however, retain jurisdiction of the case pending the adoption and approval by the voters of a valid scheme of reapportionment of the City Council." (234 F. Supp. at 959).

The counties in New York are not established nor are their boundaries drawn by the State Constitution; they are entirely creatures of the legislature. The legislature has the power to alter, amend or even abolish the present charter and its provisions for a Board of Supervisors. It could, as an illustration, create some other "elective governing body" to be elected on a county-wide basis or from election districts that it could define within the County, such body to function with respect to county legislative matters. A reapportioned legislature in New York may well decide that the mold of its creation be impressed upon the counties. Even under the present county charter, the voters can initiate a charter amendment (County Law, McKinney's Consol.Laws, c. 11, § 323). Moreover, a change in voting strength so as to equalize the supervisor representation can be effected by the supervisors themselves.

Under Section 33, subdiv. 5 of the Municipal Home Rule Law, McKinney's Consol.Laws, c. 36–a, the Board of Supervisors has ample power to provide for drafting charter amendments either under its own supervision, or under that of an officer of its designation or by a committee of its appointment or by a charter commission. Under Section 33, subdiv. 6

of the Municipal Home Rule Law, a petition by electors equal in number to ten percent of those who voted for the office of governor in the next preceding election can initiate a charter amendment by petition; the Board of Supervisors must then appoint a charter commission or put the matter to public referendum; if, on referendum, the county electors approve the appointment of a commission, the Board of Supervisors must appoint one.

When the voters in 1958 approved the Suffolk Charter and the supervisors rejected a change in voting strength in 1962, the populace was not so aware of the existence of means of redressing voting disparity as it is at present. The courts in the ensuing years have supplied many guidelines. Although no state officer is named as a defendant in this suit and even though we were completely satisfied (which we are not) that no activity of the Board of Supervisors touches upon state interests, it would be unrealistic to ignore the similarity which exists between the selection of state and county legislative bodies. In county-wide administration, just as in state-wide administration, the inhabitants of the populous areas should not be governed by representatives drawn from other and thinly populated areas.[6]

■■ It is not for the courts to prescribe the type of representative government that is best suited to the needs of the voters of Suffolk County. The task of the courts is to determine whether particular methods transgress the Constitution. The formulation of schemes of representative government, in the first instance at least, is for the agencies of political action. If an invidiously disproportionate system is continued or approved, even if by a popular majority on referendum, as in Lucas, supra, the problems implicit in the present case will remain for judicial determination.

To deny federal jurisdiction here because state officials have not been made defendants will serve no useful purpose; the defect, if such, is remediable, and despite this deficiency, the constitutional problem remains. To dismiss the complaint without prejudice to a later action alleging substantial but unsuccessful efforts to alter the existing voting procedure by political means, seems needlessly technical. The framework of the action has been constructed. The issues are clearly defined. To retain jurisdiction in the three-judge court to await developments in the state legislature or within the County itself with respect to the selection of the County's legislative body, presents a third alternative.

It is not for this court to speculate about the type of representative government Suffolk County should have. Suffice it to say that the Board of Supervisors is constituted to serve as the legislative body for the County and, upon the present undisputed population disparity, it is not representative of the voters of the County as the Supreme Court has indicated is required of legislative bodies under the Equal Protection Clause.

As stated, the solution of the present problem is, in the first instance, for the agencies of political action. It is not shown that effective and appropriate political action is fettered by any legal obstacle or rendered practically unavailable by any indurated political habit. It is inferable that the matter is ready for significant political action in the light of the analyses of governmental structure that have followed in the wake of Baker v. Carr, supra, and Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

If the same or a different but equally disproportionate system is continued, or is approved by a popular majority on referendum, the inquiry will not be at end; it will remain then to determine, if that occurs, whether apathy or even a popular majority can perpetuate or adopt a system that may be found to effect sub-

6. The five least populous towns having approximately 10% of the county's population have five supervisors with voting strength equal to the five supervisors representing the remaining 90%.

stantial disenfranchisement of voters in local-government elections.

Pending such events, the court will retain jurisdiction of the action with leave to the plaintiffs, in the event that an appropriate governing body has not been created for Suffolk County within the permitted standards for representation, to apply for further relief. At this time, it cannot be said that the legislature is unaware of the problem nor, in the light of current court pronouncements, can it now be said that it has failed to act.

The motion to dismiss the complaint is denied.

An injunction at this time would serve no useful purpose; accordingly, the application therefor is denied without prejudice to renewal.