**Robert B. BLAIKIE, Plaintiff,**

v.

**Robert F. WAGNER, Mayor of the City of New York, et al., Defendants.**

**Timothy W. COSTELLO, individually and as State Chairman of the Liberal Party of New York State et al., Plaintiffs,**

v.

**Nelson A. ROCKEFELLER, as Governor of the State of New York, et al., Defendants.**

**No. 65 Civ. 1214, 65 Civ. 1533.**

United States District Court
S. D. New York.

Oct. 14, 1965.

Theodore M. Wolkof, New York City, for plaintiff Robert B. Blaikie.

Michael J. Dontzin, Levine & Dontzin, New York City, for plaintiffs Costello et al.

Daniel M. Cohen, New York City, Louis J. Lefkowitz, Atty. Gen. of State of New York, New York City, for defendants Lomenzo, Rockefeller and Lomenzo.

John L. Radlein, New York City, Leo A. Larkin, Corporation Counsel of City of New York, New York City, for defendants Boyers, Modringo, Ruggieri, Lindsay, Connor, O'Dwyer, Farrell, Ribustello, Katz, Wagner, Screvane, Beame, Cariello, Maniscalco, Motley, Periconi, Stark, Power, Mallee, O'Rourke and Crews.

John W. Castles, 3d, New York City (Lord, Day & Lord, Genevieve L. Fraiman and Muriel Bell, New York City, on the brief), for defendants Robert S. Aldrich and Harry F. Donnelly.

Before MOORE, Circuit Judge, and WYATT and TENNEY, District Judges.

MOORE, Circuit Judge.

*The Blaikie Suit*

Plaintiff, Robert B. Blaikie, as a registered voter in the 16th election district of the 7th assembly district of New York County, sues the Mayor, the President and Clerk of the City Council of New York, the ten Councilmen-at-Large for the boroughs of Queens, Brooklyn, Staten Island, Manhattan and the Bronx (the areas of the boroughs are co-terminous with the counties of Queens, Kings, Richmond, New York and the Bronx, respectively), the three Commissioners of the Board of Elections, the Secretary of State and the Attorney General of the State of New York and seeks a judgment declaring Chapter 2, section 22 of the Charter of the City of New York [1] unconstitutional and violative of the Fourteenth Amendment of the United States Constitution in that section 22 in providing for the election of two Councilmen-at-Large from each of the five boroughs "results in a gross malapportionment and an unfair weighting of the said City Council in favor of the lesser populated boroughs of the City of New York" (Blaikie complaint) (28 U.S. C. § 2201). In addition to such a declaration, plaintiff seeks an injunction against the city officials named and the at-large members of the Council from exercising their functions as such, against the Election Commissioners from conducting an election for Councilmen-at-Large, against the Attorney General from enforcing the provisions of the City Charter and against the Secre-

---

1. Chapter 2, section 22, of the Charter of the City of New York provides:

"§ 22. Composition of council.—a. The council shall consist of the president of the council and of other members termed councilmen.

"b. One councilman shall be elected from each senate district as now or hereafter constituted lying wholly or partly within the city, and two councilmen shall be elected at large from each of the boroughs.

"c. No party or independent body as defined in the election law shall nominate more than one candidate for councilman to be elected at large in any borough.

"d. Each elector shall have the right to vote for not more than one candidate at large and the two candidates receiving the largest number of votes in each borough shall be elected.

"e. The first election of councilmen at large shall be held at the general election in the year nineteen hundred sixty-three and the terms of councilmen so elected shall expire coterminously with those of the councilmen then in office."

tary of State from distributing election material relating to the City Council.

### The Costello Suit

The plaintiffs sue both individually and as Chairmen of the Liberal Party of New York State, respectively, for the State and the five counties of the City of New York. The defendants are the Governor, the Secretary of State, the Mayor, the President of the City Council, the Comptroller, the five Borough Presidents and the three Commissioners of Election. The relief sought is a declaration (28 U.S.C. § 2201) that section 22 of the City Charter is unconstitutional because of an alleged violation of the Fourteenth Amendment of the Constitution of the United States in that each of the counties (boroughs) are entitled to elect two Councilmen-at-Large, although there is a substantial disparity in population, particularly as to Richmond County (Staten Island). Injunctive relief is sought against the Commissioners of Election, enjoining them from conducting an election for Councilmen-at-Large.

The complaints in both suits request that a three-judge court hear and determine the cases (28 U.S.C. § 2281 et seq.). Such a court has been convened. Prior to the convening of this three-judge court, a motion on various grounds to dismiss the complaint in the Costello suit as against the Governor was granted on consent by Judge Wyatt and a motion to intervene as defendants in the Costello suit by Councilmen-at-Large Aldrich and Donnelly from the Boroughs of Manhattan and Brooklyn, respectively, was granted on consent by Judge Wyatt. In both suits motions have been made for the defendant city officials and councilmen-at-large to dismiss the complaints for failure to state a claim upon which relief can be granted (Fed.R.Civ.P. 12 (b) (6)) and cross motions have been made for plaintiffs for summary judgment in their favor (Fed.R.Civ.P. 56). Oral argument in both suits was heard on June 30, 1965. The facts essential to a determination of the legal question involved are sufficiently set forth in such pleadings as have been filed. Therefore, this court will consider both cases as if motions for summary judgment had been made by the respective parties. It would be impractical to deal with each argument advanced by the respective parties in both suits, specifying the particular party sponsoring the argument. The use of the generic term, plaintiffs and defendants, however, is not intended to ascribe any such argument to any party who has not presented or adopted it.

### I.

■ Defendants initially urge that the Fourteenth Amendment was not intended to apply to voting in municipal elections. They delve at length into the legislative history of the Fourteenth Amendment and conclude that cases previously decided, holding to the contrary, gave no consideration to the legislative history; hence, they cannot be regarded as controlling precedents.

The questions of justiciability and the applicability of the so-called "one-man-one-vote" principle to legislative bodies at a lesser than State level were carefully considered in Bianchi v. Griffing, 238 F.Supp. 997 (D.C.1965), appeal dismissed 382 U.S. 15, 86 S.Ct. 52, 15 L.Ed. 2d 11 (1965). Although there were decisions of the Supreme Court which would have supported a contrary result and although persuasive arguments can be made to the effect that government at such levels should be by the people and not by the judiciary, the decisions of various courts, State and Federal, so overwhelmingly point to the principle's application at County and City levels that in Bianchi this particular Rubicon was crossed. Furthermore, logic, for whatever merit it may have in this situation, is persuasive against a re-crossing. Concededly, the City Council is the legislative body enacting laws affecting the lives of over eight million people—a population far greater than that of many States.

### II.

The section attacked is section 22 of the New York City Charter adopted by the people of the city on November 7, 1961, under the provisions of Chapter 87 of the Laws of the State of New York

for 1961. Section 21 vests the city's legislative power in the City Council. The "composition" (sec. 22) of the Council is to consist of a President and one councilman from each senate district wholly or partly within the city and two councilmen-at-large from each of the boroughs. By law (Laws of 1965, Chap. 16, Sec. 1, effective March 29, 1965), the Charter was amended to provide for the division of the city into twenty-seven councilmanic districts "in such manner that such districts shall be as nearly equal in voter population * * * or as nearly equal in number of inhabitants or in number of citizens, as is practicable, * * *." On June 1, 1965, these districts were established.[2] No complaint is made that these now existing districts do not afford to each voter in each district an opportunity to vote for his district's councilman or that there is district inequality. Thus, the Council consists of a president (non-voting except in case of a tie) and thirty-seven councilmen (27 from the districts, ten (2 each) from the five boroughs). A majority affirmative vote is required for the enactment of any local law or resolution (Chap. 2, Sec. 34). As a consequence, nineteen votes are necessary before any local law is imposed on the people.

*The Councilmen-at-Large*

The Charter provides that "two councilmen shall be elected at large from each of the boroughs" (Sec. 22, subd. b). Further limiting restrictions are imposed by the requirements that

"c. No party or independent body as defined in the election law shall nominate more than one candidate for councilman to be elected at large in any borough." and

"d. Each elector shall have the right to vote for not more than one candidate

at large and the two candidates receiving the largest number of votes in each borough shall be elected."

This somewhat unusual method of selection of the city fathers is not a quixotic and ingenious scheme by a well-entrenched minority to foist its will on a majority by means of the apportionment of representatives amongst districts designed to attain this result. Quite to the contrary, this plan was evolved after a "lengthy and thoughtful study by two successive commissions in order to make possible the election of minority representatives." Matter of Blaikie v. Power, 13 N.Y.2d 134, 243 N.Y.S.2d 185, 193 N.E.2d 55 (1963). These distinguished [3] commissions had as their purpose the creation of a formula for voting which would "make representative government a reality." Johnson v. City of New York, 274 N.Y. 411, 9 N.E.2d 30 (1937).

This court, being a part of the judicial system available to the people of the City of New York (upon proper jurisdictional grounds), must of necessity be mindful of (in fact, probably should take judicial notice of) the character of the voting population and the various areas which over the years have been merged to constitute the present City. Many races exist here in numbers often said to be exceeded only by the population of the capitals of their native lands. Many political parties, each offering their own panaceas to the electorate, appear on the ballot. What would the councilman from Tottenville, Staten Island, know from direct and daily experience of the local problems of Canarsie, Brooklyn, or the councilman from the Westchester line of the Bronx know of the racial and housing congestion problems of the lower east side of Manhattan? The first focal point for judicial

---

2. Under Local Law 55 of 1965 (amending Chapter 51 of the Administrative Code of the City of New York, adding title Z, to title Y) enacted June 1, 1965 by the City Council, the single-member districts were redrawn and increased to 27, the Bronx and Queens each having an additional councilman, and Richmond sharing its councilman with a portion of Brooklyn.

3. New York State Commission on Governmental Operation of the City of New York (Hon. Frank C. Moore, Chairman, reporting February 20, 1961); Charter Revision Commission (Hon. John T. Cahill, Chairman, reporting August 4, 1961).

scrutiny is whether the councilmen representing Canarsie and Tottenville can by teaming up together impose the will of a small number of voters upon a much larger group who by reason of inadequate representation are unable to resist.

An analysis of the structure of the City Council demonstrates that every district in the entire city has its spokesman and on an equal population basis. Thus, twenty-seven votes are beyond question. Nineteen votes are required for city legislation. To these twenty-seven, ten members are added. Of the ten, eight come from boroughs ranging in population (Blaikie, Complaint) from 1,424,551 Bronx, 1,698,281 Manhattan, 1,809,578 Queens, to 2,627,313 Brooklyn. This leaves "little" (221,991) Staten Island as the giant ogre which, with its two councilmen-at-large—2/37ths of the votes—supposedly, according to the *Blaikie* and *Costello* complaints, is wreaking its minority will upon the vast population of the other boroughs utterly defenseless except for their 35/37ths representation. Parenthetically "little" may soon be an incorrect adjective because with the advent of the Verrazzano Bridge and the vast housing developments in progress, substantial population changes may be expected.

However, as the reports of the two commissions indicate, the policy behind the creation of the councilmen-at-large was not to give Staten Island three councilmen. Its purpose, potentially at least, to give minority party representation to all boroughs is just as applicable to the other four presently much larger boroughs as it is to Staten Island.

No better expression of the praiseworthy objectives of the two commissions' efforts and the resulting legislation can be found than in Judge Fuld's opinion in Matter of Blaikie, supra, in which he said:

"The repeated efforts of New York City, extending over the last century,

to provide some form of minority representation in the machinery of local government is evidence of the widespread feeling that such representation can play an important role in a democracy." (13 N.Y.2d at 143, 144, 243 N.Y.S.2d at 190).

The Charter Revision Commission recommended that "The election of such borough-wide Councilmen [the councilmen-at-large] may be by a system limiting each voter to vote for a single borough-wide candidate, thus making possible the election of minority representatives." (Preliminary Report, July 20, 1961, p. 3.) The Final Report contained the same "limited voting" proposal to be submitted to the electorate with the further proviso that "a party or independent body may nominate only one candidate for Councilman-at-Large in each borough." (Final Report, August 4, 1961, p. 1.) The Charter (effective January 1, 1963) was adopted at the election of November 7, 1961, by a vote of 689,405 to 283,982. By Local Law 55 (June 1, 1965), the Council district lines were redrawn "to implement the judicial mandate of 'one-man, one-vote' in the Election of district Councilmen" (Report, Special Bi-Partisan Committee to Consider Reapportionment and Redistricting of Councilmanic Districts, City Record, May 27, 1965, pp. 3734 et seq.). The districts were thus increased from 25 to 27; the Councilmen-at-Large (10) remained the same.

There are cogent reasons underlying this plan. Were there to be a city-wide election for Council members, there would exist a real danger of an absolute monopoly by a single party. The equal districting reduces this possibility but only to a minor extent. For some years (1936–1947) the City tried a "Proportional Representation" (P. R.) system, which although it embodied a "limited voting" theory was upheld by New York's highest court.[4]

4. 274 N.Y. 411, 9 N.E.2d 30.
It is interesting to note (The New York Times, August 22, 1965, p. 65) that a Committee headed by Franklin D. Roosevelt, Jr., known as the "Proportional Representative Campaign Committee", has been formed to re-establish a P.R. system.

A profound student and analyst of the reapportionment and redistricting problems in the counties and cities of New York State and who is no mere theorist has taken note of New York City's method of choosing its representatives ("The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government" by Professor Jack B. Weinstein, 65 Colum.L.Rev. 21, 1965.

> "This assignment of two at-large councilmen's posts to each borough, regardless of its population, creates a built-in and deliberate disproportion of voting strength favoring the less populated boroughs. Whether the discrimination in New York City is de minimis or whether it can be justified upon the ground that the city is historically a federation of formerly independent municipalities is not completely clear" (pp. 39–40).

The Weinstein conclusion, which seems inevitable from the constituency of the Council, is that "The requirement that the two at-large representatives come from different parties does not appreciably affect the one man, one vote concept in New York City." (Id. at 39 n. 81.)

The Corporation Counsel advances the arguments that Matter of Blaikie, supra, deciding that the councilmanic election system does not violate the Fourteenth Amendment supports his res adjudicata theory and that the Supreme Court's dismissal of the appeal for want of a substantial federal question, 375 U.S. 439, 84 S.Ct. 507, 11 L.Ed.2d 471 (1964), further buttresses it. This dismissal preceded the June 15, 1964 Supreme Court decisions.[5] Plaintiffs, however, retort by saying, "true but after these cases had been argued."

Speculation as to the meaning and import of these Supreme Court decisions is unnecessary. The issues and problems presented in the June 15, 1964 cases are not the issues and problems here. Far more relevant are the Court's comments in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961) in noting that "Tedesco v. Board of Supervisors, 339 U.S. 940 [70 S.Ct. 797, 94 L.Ed. 1357] indicates solely that no substantial federal question was raised by a state court's refusal to upset the districting of city council seats, especially as it was urged that there was a rational justification for the challenged districting" (at 235, 82 S.Ct. at 720). The key in all these cases must be found in the words "rational justification." The judiciary in reaching their ivory towers must, of necessity, traverse mundane city streets and cannot, or at least should not, be unmindful of the conditions they observe. For example, were New York City governed by ten councilmen (two from each borough) because of the disparate size of the boroughs, there can be no doubt that the reasoning in Bianchi,[6] Ellis v. Mayor etc., of Baltimore,[7] Brouwer v. Bronkema,[8] and State ex rel. Sonneborn v. Sylvester,[9] would apply. Were New York City to be of the size of Binghamton and as comparatively homogeneous, the result reached by the New York Court of Appeals in Seaman v. Fedourich, 16 N.Y.2d 94, 262 N.Y.S.2d 444, 209 N.E.2d 778 (1965), might be persuasive. Here, however, this court is confronted with none of the evils which the courts in these other cases were forced to counteract by their decisions. The disparity in voting strength in the City Council between the boroughs due to the method of election of the councilmen-at-large is not substantial but minimal. The people of New York are fairly represented in their legislative body. There is no present ability on the part of the three (out of thirty-seven) Staten Island councilmen to enact city legislation detrimental to the mass of

---

5. See cases collected in 238 F.Supp. at 999 n. 1.

6. 238 F.Supp. 997 (1965).

7. 234 F.Supp. 945 (1964).

8. Circuit Court for the County of Kent, No. 1855, September 11, 1964.

9. 26 Wis.2d 43, 132 N.W.2d 249.

voters of Manhattan, Bronx, Brooklyn and Queens. The present system was deliberately designed to afford at least the possibility of representation to a large segment of the population and to enable them through party representation to obtain it.

█ "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Acting under this principle and that of "rational justification", as enunciated by the Supreme Court, this court concludes that the present system by which councilmen are selected and elected to govern the City of New York does not violate the Fourteenth Amendment and that section 22 of the City Charter is not unconstitutional.

Summary judgment is granted in favor of the defendants in the *Blaikie* and *Costello* suits and all injunctive relief requested denied.