DAVID G. HANLON AND OTHERS v.
RICHARD L. TOWEY AND OTHERS.
LAWRENCE W. SCHULZ AND OTHERS, APPELLANTS.

142 N. W. (2d) 741.

May 20, 1966—Nos. 40,084, 40,203.

N. W. (2d) 405, 412; Veum v. Sheeran, 95 Minn. 315, 104 N. W. 135; Hulett v. Carey, 66 Minn. 327, 69 N. W. 31.

*Daniel F. Foley,* for appellants.
*O'Brien, Ehrick & Wolf,* for respondents.

ROGOSHESKE, JUSTICE.

This appeal concerns the effect of the "one man, one vote" principle of the reapportionment decisions of the United States Supreme Court upon the redistricting of county commissioner districts by population under the statutory form of county government in our state.

As presently constituted, the county is an important, general-purpose unit of local government. It is wholly a creature of statute, having no inherent sovereignty, existing by legislative sufferance, and subject to legislative control in the exercise of a growing number and variety of delegated state powers on a level bringing it very often into direct contact with the people it serves. By express legislative design, it has a representative form of government in which ultimate control is vested in the voters of the county and the powers delegated are exercised by an elected board of commissioners. Pursuant to Minn. St. 375.02, each board must apportion its county into either five or seven geographic districts containing "as nearly as practicable an equal population." Qualified residents of each district are given the right to elect their representative on the board of commissioners.

The narrow question we decide is whether that part of § 375.02[1]

---

[1] Minn. St. 375.02 provides in pertinent part: "Each county shall be divided into as many districts * * * as it has members of the board. * * * [S]uch districts shall * * * contain as nearly as practicable an equal population. Counties may be redistricted by the county board after each state or federal census, except that no county shall * * * redistrict so that any city of the second, third or fourth class shall be in more than two commissioner districts in any one county."

which empowers the board to redistrict but which limits cities of the second, third, and fourth class to two commissioner districts violates the equal protection clause of the Federal Constitution and the equivalent provision in our state constitution. Stated another way, the question is whether Federal constitutional standards of equal representation under the principle of "one man, one vote" apply to the apportionment of county commissioner districts. Upon the facts before us, we hold that the Federal standards apply and that the limitation provision of the statute violates the equal protection clause of the Federal Constitution.

The question arises in a declaratory judgment action brought by voters of Olmsted County challenging the validity of two redistricting resolutions, one adopted by the county board on April 6, 1960, and thereafter, while the action was pending, insignificantly modified by the other on July 10, 1963. Both redistricting plans, in obedience to the challenged provision of the statute, limited the city of Rochester (which has a population of 40,663 as against 65,532 for the entire county) to two commissioner districts. In accordance with the redistricting effected by the July 10, 1963, resolution, the county board is now composed of two commissioners representing the 1st and 2nd Districts, comprising the city of Rochester (a city of the second class),[2] and three commissioners representing the 3rd, 4th, and 5th Districts outside the city. It is undisputed that the two city representatives are elected by 62 percent of the total population of the county, while the three commissioners representing districts outside the city are elected by only 38 percent of the population. As the evidence obviously required, the trial court determined that the apportionment of the population among the five districts results in a significant undervaluation of the weight of the vote of each voter residing in the two districts comprising the city. The court concluded that in so far as § 375.02 limits cities of the second, third, or fourth class, regardless of population, to two commissioner districts, it violates the equal protection clause of the Fourteenth Amendment to the Federal

---

[2] For legislative purposes, cities in Minnesota are divided according to population into four classes: First class, more than 100,000; second class, more than 20,000 but less than 100,000; third class, more than 10,000 but less than 20,000; and fourth class, less than 10,000.

Constitution [3] and art. 1, § 2, of the constitution of this state.[4] The court further found that—

"* * * it is feasible and practicable * * * to redistrict Olmsted County in such a way that each of the five commissioner districts will contain a nearly equal population * * *."[5]

Accordingly, the court ordered the county board to redistrict and retained jurisdiction to determine, if necessary, whether the redistricting ordered meets constitutional standards.[6]

Appellants [7] do not challenge the court's finding and conclusion of a

---

[3] U. S. Const. Amend. XIV, § 1, provides in part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state * * * deny to any person within its jurisdiction the equal protection of the laws."

[4] Minn. Const. art. 1, § 2, provides in part: "No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers."

[5] This finding, amply supported by the evidence, was properly made to conform to State ex rel. South St. Paul v. Hetherington, 240 Minn. 298, 61 N. W. (2d) 737, where an action challenging a county redistricting plan was remanded for taking additional evidence as a basis for determining whether gross inequalities in population were unavoidable.

[6] The court further declared unconstitutional those provisions of § 375.02 which respondents contend make redistricting discretionary with the board and which authorize submission to the voters of the county the question of whether or not to redistrict. Since the board did in fact redistrict and the matter was not submitted to the voters, the constitutionality of those provisions is not presented in this case. It should be noted, however, that a voter's standing to challenge malapportionment in both Federal and state courts is well established. See, State ex rel. South St. Paul v. Hetherington, *supra;* Baker v. Carr, 369 U. S. 186, 82 S. Ct. 691, 7 L. ed. (2d) 663. Further, with respect to state legislative reapportionment, it was held in Lucas v. Forty-Fourth General Assembly of Colorado, 377 U. S. 713, 736, 84 S. Ct. 1459, 1473, 12 L. ed. (2d) 632, 647, that "[a]n individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate."

[7] The county and only the three commissioners representing the rural districts appeal. Although there are 11 counties containing cities of the various

substantial dilution of the voting rights of urban residents. Indeed, under the 1963 redistricting, a comparison of the population of the 1st and 2nd Districts, comprising the city, with that of each of the three rural districts reveals a significant disparity:

| 1st District | 19,182 or 29.2% |
|---|---|
| 2nd District | 21,481 or 32.8% |
| 3rd District | 8,708 or 13.3% |
| 4th District | 9,230 or 14.1% |
| 5th District | 6,931 or 10.6% |

It is obvious that the voters in the 3rd, 4th, and 5th Districts have greater representation per person on the governing board than voters in the city districts. Applying the principle of "reasonable equality," which long prior to the United States Supreme Court decisions we declared to be the command of the statute,[8] it is evident that this disparity can operate to give the vote of each rural voter over twice the weight of a city voter, since the commissioners representing only 38 percent of the population could adopt or veto any action of the board despite the opposition or support of commissioners representing 62 percent of the county residents.

Be that as it may, appellants contend that no relief can be granted because (1) no provision of our constitution requires apportionment of commissioner districts by population; (2) no decision of the United States Supreme Court has yet applied Federal constitutional standards to require apportionment of "local legislative bodies in a state" according to population; (3) the establishment and design of county government, including the apportionment of commissioner districts, is solely a legislative prerogative; and (4) the board strictly complied with the requirements of a statute held constitutional in State ex rel. Blink v. Cooke, 195 Minn. 101, 262 N. W. 163, where the very provision now under attack

---

classes which, according to population comparison between the city and rural areas, might require redistricting as a result of the trial court's decision, none sought to intervene in support of appellants' position during the pendency of this action or to be heard on appeal.

[8] State ex rel. South St. Paul v. Hetherington, *supra*.

was held constitutionally permissible against a challenge by a resident of this same county over 30 years ago.

Before discussing the issue confronting us, we will refer briefly to the historical background of the problem and the intended purpose of the limiting provision. Prior to 1958, Minn. Const. art. 11 imposed important limitations upon the power of the legislature over counties, including the requirement that (§ 4) "[p]rovision shall be made by law for the election of such county or township officers as may be necessary." By amendment of art. 11 in 1958, the legislature was given greater powers to create, modify, or dissolve counties at will. There is now no provision requiring the election of county officials, nor any provisions expressly or impliedly requiring a representative form of government or a division of the county into districts according to population. The legislative history of Minn. St. 375.02 discloses that almost since statehood,[9] the form of county government has been and still is designed to be controlled by the voters vested with the right to elect representatives from geographic areas divided according to population. The provision limiting residents of a city of the second class to two representatives on the board did not appear until 1933. L. 1933, c. 363. Its intended purpose, as declared by both the majority and minority opinions in State ex rel. Blink v. Cooke, 195 Minn. 101, 104, 262 N. W. 163, 164, was to prevent "the urban population from dominating * * * and from governing" counties containing a city of the second class, thereby, as expressed by the minority, insuring "the power of domination" by the rural population. In 1957, cities of the third and fourth classes were added to the proviso (L. 1957, c. 345), thus preserving and extending domination by the rural population to counties threatened by the expanding population of municipalities of those classes.

It is significant that the 1933 amendment was enacted during the pendency of an action by a resident of this same county seeking to compel redistricting. It was immediately attacked as arbitrary and discriminatory class legislation in violation of Minn. Const. art. 4, §§ 33, 34. The trial court agreed with this contention, but this court, by a divided

---

[9] L. 1860, c. XV, art. II.

vote, reversed, stating (State ex rel. Blink v. Cooke, 195 Minn. 104, 262 N. W. 164):

"The second class cities of this state are in counties essentially rural in character, and in our opinion the legislature was justified in its classification of these counties for the purpose of preventing the urban population from dominating them and from governing the counties and possibly from expending county funds wholly or principally in the interest of the cities within their boundaries."

Although there was a suggestion in the brief filed by respondent in that case that the classification also offended the equal protection clause of the Fourteenth Amendment to the Federal Constitution, it is obvious that the question now presented was neither raised nor passed upon. Appellants' almost total reliance upon this case as controlling is therefore clearly misplaced. In so far as the general language of that opinion indicates that the legislative power over counties is immune from every constitutional challenge, it must now be disregarded as clearly in conflict with recent United States Supreme Court decisions concerning the scope of protection afforded by the equal protection clause.

The United States Supreme Court has repeatedly declared that all qualified voters have a constitutionally protected right to vote in state as well as Federal elections;[10] that the initial and primary responsibility to protect against any denial or infringement of that right rests upon the state;[11] and that the right to vote freely for the candidate of one's choice is the essence of a democratic system, and any restriction on that right strikes at the heart of the Federal constitutional guarantee to every state of a representative form of government.[12]

Undoubtedly motivated by the continuing expansion of the scope of the right to vote in this country[13] and the asserted ineffectiveness of the

[10] Reynolds v. Sims, 377 U. S. 533, 84 S. Ct. 1362, 12 L. ed. (2d) 506.

[11] United States v. Cruikshank, 92 U. S. 542, 23 L. ed. 588; Gomillion v. Lightfoot, 364 U. S. 339, 81 S. Ct. 125, 5 L. ed. (2d) 110.

[12] Reynolds v. Sims, *supra.*

[13] Reynolds v. Sims, 377 U. S. 533, 555, note 28, 84 S. Ct. 1362, 1378, 12 L. ed. (2d) 506, 523.

protection of this right afforded by the states, the court held in the seminal case of Baker v. Carr, 369 U. S. 186, 82 S. Ct. 691, 7 L. ed. (2d) 663, that the equality-of-rights principle of the equal protection clause of the Fourteenth Amendment imposed upon the Federal courts *the duty and the power to adjudicate a claim by a state voter that his right to vote was effectively impaired by dilution* as a result of the malapportionment of a state legislature. This case was followed by a series of now well-known and much-discussed decisions[14] which led to the holding that the equal protection clause of the Federal Constitution requires that representation in both houses of state legislatures be proportionate to the number of persons represented under the principle labeled "one man, one vote." Despite the absence of any specific constitutional provision requiring apportionment of state legislative districts on an equal-population basis, these decisions make it unmistakably clear that the site of a citizen's home—like race, creed, or color, and most recently, affluence—does not afford a permissible basis for distinguishing between qualified voters within the state.[15] While it is true that no decision of the United States Supreme Court has yet applied the equal protection principle to "local legislative bodies in a state," there is every indication that the right to vote for representatives upon a county board as presently constituted in our state does have constitutional significance. The language of the decisions affords appellants little comfort and indeed no discernible support for their claim that the legislative power over apportionment of voters vested with the electoral control of county government is absolute, untrammeled by constitutional restraint. In Gray v. Sanders, 372 U. S. 368, 379, 83 S. Ct. 801, 808, 9 L. ed. (2d) 821, 829, it was said:

---

[14] Gray v. Sanders, 372 U. S. 368, 83 S. Ct. 801, 9 L. ed. (2d) 821; Reynolds v. Sims, *supra;* WMCA, Inc. v. Lomenzo, 377 U. S. 633, 84 S. Ct. 1418, 12 L. ed. (2d) 568; Maryland Committee for Fair Representation v. Tawes, 377 U. S. 656, 84 S. Ct. 1429, 12 L. ed. (2d) 595; Davis v. Mann, 377 U. S. 678, 84 S. Ct. 1441, 12 L. ed. (2d) 609; Roman v. Sincock, 377 U. S. 695, 84 S. Ct. 1449, 12 L. ed. (2d) 620; Lucas v. Forty-Fourth General Assembly of Colorado, 377 U. S. 713, 84 S. Ct. 1459, 12 L. ed. (2d) 632.

[15] Gray v. Sanders, *supra;* Harper v. Virginia State Board of Elections, 383 U. S. 663, 86 S. Ct. 1079, 16 L. ed. (2d) 169.

"* * * Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions."

More pointedly, in Reynolds v. Sims, 377 U. S. 533, 562, 84 S. Ct. 1362, 1382, 12 L. ed. (2d) 506, 527, the court declared:

"Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. * * *

"* * * [R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. * * *

*   *   *   *   *

"* * * A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men."

And in Gomillion v. Lightfoot, 364 U. S. 339, 81 S. Ct. 125, 5 L. ed. (2d) 110, where racially based gerrymandering of a city's boundaries by legislative act removed all save four or five of the city's 400 negro voters, the court declared that despite the breadth and importance of a state's plenary power over its municipalities, the act, if employed as a device to deprive colored citizens of their municipal franchise, violated rights protected by the Fifteenth Amendment and, in the concurring opinion of Mr. Justice Whittaker, the equal protection clause of the Fourteenth Amendment. In reaching that conclusion, the court stated (364 U. S. 347, 81 S. Ct. 130, 5 L. ed. [2d] 117):

"When a State exercises power wholly within the domain of state in-

terest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."

The import of these decisions compels us to join with the courts of Wisconsin [16] and South Dakota [17] and lower Federal courts [18] in concluding that the equal-population principle embodied in the equal protection clause as applied to legislative apportionment also applies to the representative form of our county government.

While it appears to be well within the power of the legislature under Minn. Const. art. 11 to withdraw county government from electoral control and appoint or otherwise designate municipal officials ex officio to exercise the powers delegated to the county without running afoul of the equal protection clause, so long as the present system of a representative form of government is maintained, the fundamental nature of the right to vote inescapably requires the application of fundamental principles. Although not urged by appellants, the fact that the right to vote is granted by statute rather than by our constitution is a distinction without constitutional significance. Once granted, it becomes a fundamental right indigenous to self-government and preservative of other civil and political rights, including the right to equal representation. Thus, whether granted by the constitution or by statute, any substantial dilution of the right because of the place of residence of a voter impairs basic constitutional guarantees. In State ex rel. South St. Paul v. Hetherington, 240 Minn. 298, 303, 61 N. W. (2d) 737, 741, wherein the redistricting of Dakota County was challenged, Mr. Justice Matson declared in language remarkably similar to the expressions of United States Supreme Court decisions uttered long afterward:

"* * * The right to vote on a basis of reasonable equality with other citizens is a fundamental and personal right essential to the preserva-

---

[16] State ex rel. Sonneborn v. Sylvester, 26 Wis. (2d) 43, 132 N. W. (2d) 249.

[17] Bailey v. Jones (S. D.) 139 N. W. (2d) 385.

[18] Ellis v. Mayor and City Council of Baltimore (4 Cir.) 352 F. (2d) 123; Bianchi v. Griffing (E. D. N. Y.) 238 F. Supp. 997.

tion of self-government. Fundamental rights may be lost by dilution as well as by outright denial. To whatever extent a citizen is disenfranchised by denying him reasonable equality of representation, to that extent he endures taxation without representation and the democratic process itself fails to register the full weight of his judgment as a citizen."

We limit our decision to a determination that the equality-of-voting-rights principle, declared embodied in the equal protection clause of the Federal Constitution and its equivalent contained in our state constitution, applies to county government as now constituted. We are well aware of its impact upon all other counties which have cities of predominant population within their boundaries. Their nonintervention in this case suggests at least that they do not share appellants' confidence in the validity of the provision under attack.

We are mindful of the difficult problems this holding may visit upon the legislature in responding to the protests of those who will insist upon maintaining electoral control of county government while at the same time demanding recognition of the claimed diversity of interest between the residents of the rural and urban areas of the county. As declared in State ex rel. Blink v. Cooke, *supra,* a classification of counties based upon the legislature's prerogative to determine that such diversity in fact exists is not constitutionally unreasonable. However, redistricting which gives effect to claimed conflicting interests between rural and urban residents in a county government directly controlled by voters inescapably results in domination by the voters of one area over the other. On the other hand, ignoring the existence of any recognizable greater interests of the rural population and redistricting upon a population basis alone may result in unfair domination by the voters of the area of greater population. The resolution of this seeming impasse can have a profound effect upon county government as it now exists. Perhaps one solution may be found in devising procedures which will afford protection to the minority population possessing the greater interest.[19]

---

[19] Conceivably, in exercising those powers which necessarily may affect the interest of some residents more than others, a unanimous or four-fifths vote of the county board may justifiably be required without running afoul

We are also mindful of the argument that could have been made (contrary to the assumption of the parties to this appeal) that any powers delegated to county boards which might be classified as legislative in character are so minimal that the county must be viewed as an administrative unit of local government, distinctly dissimilar to a municipal corporation vested with a substantial quantum of the legislative power of the state. We cannot ignore the force of this argument since the impact of the reapportionment decisions necessarily depends upon the type and purpose of the governmental unit involved. However, it must be recognized that the county board's power with respect to taxation, the county budget, capital improvements, welfare, health, the administration of justice, zoning, and many other areas of public service is quite different in variety and scope than that possessed by an administrative or special-purpose unit of government. Without spelling out the functions which we believe reflect the delegation of substantial legislative power, it is sufficient to say that an examination of the statutes dealing with the power delegated persuades us that the legislature itself does not regard the county as solely an administrative arm of state government. In fact, the tendency in this state, as elsewhere, is to enlarge the importance and magnitude of county functions.[20]

Appellants' other claims of error are groundless and do not require discussion.

For these reasons, we agree with the conclusion and reasoning of the trial judge, expressed in his helpful memorandum, that the decisions of the United States Supreme Court dictate the result in this case.

Affirmed.

---

of Federal constitutional requirements. See, Weinstein, *The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government,* 65 Col. L. Rev. 21, 40.

[20] See, National Municipal League, Model County Charter 1 (1956); U. S. Advisory Comm. on Intergovernmental Relations, Alternative Approaches to Governmental Reorganization in Metropolitan Areas 39 (1962); Kneier, *The Legal Nature and Status of the American County,* 14 Minn. L. Rev. 141.