[No. 45143.   En Banc.   January 8, 1979.]

EDWARD R. STORY, *Respondent,* v. DELMON
L. ANDERSON, ET AL, *Appellants.*

David F. Thiele, Prosecuting Attorney, and Alan R. Hancock, Deputy, for appellants.

Ted D. Zylstra (of Zylstra & Beeksma), for respondent.

HICKS, J.—Respondent, a resident of north Whidbey Island, sought a writ of mandamus in Superior Court directing the commissioners of Island County to divide the county into three districts for the purpose of electing county commissioners so that each district would comprise, as nearly as possible, one–third of the population of the county. The court issued the writ, finding the statutory scheme allowing counties composed entirely of islands to establish districts for election of commissioners without regard to population unconstitutional as a violation of the equal protection clause of the United States Constitution. We granted direct review of the trial court's issuance of the writ and we reverse.

Island County is located in Puget Sound and consists primarily of Whidbey Island, Camano Island, and two small, relatively unpopulated islands. Whidbey Island is connected at its north by a bridge to the mainland and on its south by a ferry to the mainland. Camano Island connects to the mainland by a bridge. The county seat is located at Coupeville in the center of Whidbey Island and is reached by either highway or ferry from the mainland. There is no direct ferry service or bridge between Camano

and Whidbey Islands and no scheduled public transportation between these islands.

There are three commissioner districts in Island County. The first is made up of central and south Whidbey Island, the second of northern Whidbey Island, and the third encompasses all of Camano Island. The first district has in central Whidbey Island a predominantly agricultural area with the southern part of the district open space containing a scattering of commercial and residential development. District two has a large naval airfield within its boundaries and also contains the city of Oak Harbor, the only incorporated area in Island County with a population in excess of 1,000. Its 1973 population was estimated at 10,445. There are a number of urban areas surrounding the base with several light industrial uses. As of April 1, 1977, 6,620 military personnel, plus their dependents, were attached to the naval air station. A large majority of these personnel reside in commissioner district two.

Commissioner district three, Camano Island, is essentially a residential area with the shorelines completely populated and continuing residential development of the inland areas as well.

The population of Island County on June 9, 1977, included 9,228 persons in district one, 24,646 in district two, and 3,589 in district three. As of April 1, 1977, the registered voter totals in the respective districts were 6,058 in district one, 7,657 in district two, and 2,510 in district three.

County commissioners are elected in a uniform way in all counties throughout this state. A candidate for that office must be a qualified elector from the district from which nomination is sought. Nomination is either through the primary election or a minor party convention. Only qualified electors from that district may participate in the primary election or convention. RCW 29.18 and RCW 29.24. In the general election, all qualified voters in the county

vote for the candidates for each commissioner position. RCW 36.32.050.[1]

■ Respondent claims and the trial court agreed that the primary election scheme as applied to Island County is violative of the equal protection clause of the fourteenth amendment to the United States Constitution because of the special proviso allowing unequally populated districts in counties composed entirely of islands. Thus the only issue which we are asked to decide is whether the current Island County district scheme established under RCW 36.32.020(1) violates the equal protection clause of the federal constitution. We conclude that it does not.

*Dallas County v. Reese*, 421 U.S. 477, 44 L. Ed. 2d 312, 95 S. Ct. 1706 (1975), a recent pronouncement of the Supreme Court concerning a county election scheme challenged on equal protection grounds teaches that the standard for passing constitutional muster in a local election proceeding is the occurrence of invidious discrimination in fact, not achievement of mathematical exactness in residency or nomination districts. The opinion is per curiam and there are no additional views.

Dallas County, Alabama, in which the city of Selma is situate, is locally governed by an elected county commission. Four commission members are elected from four residency districts. Here we are concerned with three commissioners and three residency (commissioner) districts.

In Dallas County, the constitutional challenge was premised on the fact of substantial variance of population among the four residency districts. This resulted in the City of Selma having but one representative on the commission, though it had about one–half the population of the county.

---

[1] "County commissioners shall be elected by the qualified voters of the county and the person receiving the highest number of votes for the office of commissioner for the district in which he resides shall be declared duly elected from that district." RCW 36.32.050.

As stated above, a similar variance in population among the commissioner districts exists in the instant case.

In *Reese v. Dallas County,* 505 F.2d 879 (5th Cir. 1974), the majority of the Court of Appeals sitting en banc had concluded that unequal residency districts diluted the votes of the city (Selma) residents, and that the resulting discrimination was invidious. On appeal, the Supreme Court reversed and remanded for further proceedings, holding that a successful attack raising such a constitutional question must be based on *findings that the scheme in fact operated impermissibly to dilute the voting strength of an identifiable element of the voting population.*

In Island County, as in Dallas County, the election scheme is established by state statute. As in Dallas County, Island County submits its commissioners to county–wide balloting in the general election, though Island County differs from Dallas County in that participants in its nominating selection process come solely from within the commissioner district. This is accomplished by primary election or under RCW 29.24 (Nominations Other Than By Primary), by a convention process. A miniscule number of voters may nominate under this latter procedure.

Assuming that a minimum of two candidates, one from each major party, are nominated by primary election in each commissioner district, and keeping in mind that minor parties may nominate pursuant to RCW 29.24 and that RCW 29.51.170 authorizes "write–in" (sticker) candidates in the general election, it is patently evident that the tenure of the candidate who achieves office is dependent on the county–wide electorate, not the nominating selection process. The Supreme Court, after stating that *Dusch v. Davis,* 387 U.S. 112, 18 L. Ed. 2d 656, 87 S. Ct. 1554 (1967) controls in *Dallas County,* went on to say that:

> *Dusch* reaffirmed the principle enunciated in *Fortson v. Dorsey,* 379 U.S. 433, 438 [13 L. Ed. 2d 401, 85 S. Ct. 498] (1965), that when an official's "tenure depends upon the county–wide electorate he must be vigilant to serve

the interests of all the people in the county, and not merely those of people in his home district."

*Dallas County v. Reese, supra* at 479–80. At another point the court said at page 480:

Similarly, in *Dusch* we approvingly quoted a portion of the District Court's opinion, including the following passage:

"'As the plan becomes effective, if it then operates to minimize or cancel out the voting strength of racial or political elements of the voting population, it will be time enough to consider whether the system still passes constitutional muster.'"

The principle that county–wide balloting in the general election assures vigilance in representing all county citizens is valid is implicit in this state's county commissioner system. Even in those counties whose commissioner districts are absolutely perfectly balanced in population, only one-third of the electorate at most may participate in the nominating selection process in a primary election. Considerably less of the electorate may nominate in an RCW 29.24 procedure. Whatever the nomination process, the county–wide electorate makes the ultimate decision in the general election. Likewise, it is only the county–wide electorate that may recall the commissioner who proves to be not vigilant to serve the interests of all. RCW 29.82.

On the record presented to this court, no invidious result is or can be shown from the election scheme used in Island County. That is the test of its constitutionality under *Dallas County v. Reese, supra,* and the cases upon which Dallas County relies. The Island County system is not invidiously discriminatory; it has not operated to minimize or cancel out the strength of any racial or political element of the voting population of the county. Indeed, it is difficult to visualize how it ever could, given the convention nominating process of RCW 29.24 which permits any minority that can muster as few as 100 qualified voters to place a nominee on the ballot in the general county–wide election.

Until such debilitating facts are demonstrated, it is our view that we should refrain from tampering with the election system the legislature has selected for this county. It is legislative wisdom, not ours, that must prevail until the system's unconstitutionality is established. Even then, it would not be the prerogative of this court to decree what election system must be used in Island County, only that the constitutionally impermissible system may not be used.

Reversed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, and DOLLIVER, JJ., concur.

[En Banc.     March 8, 1979.]

UTTER, C.J. (dissenting)—The majority upholds a primary election system which allows a small number of voters in Island County to disproportionately affect the election of the board of county commissioners. This is apparently upon the assumption that the "one person, one vote" principle inherent in the federal constitution is inapplicable to the primary. As the primary election is the first critical step in the choice of a commissioner by the electors, this assumption is erroneous. Examination of the federal standards, enunciated by the United States Supreme Court and controlling on the issue before us, unequivocally demonstrates the constitutional infirmity of the Island County procedure, and therefore I must dissent.

As in all of the state's counties, each commissioner in Island County is nominated solely by electors from within the district where the commissioner resides. By law these districts generally are of equal population size, RCW 36.32-.020, so voters through the nomination procedure generally may not disproportionately affect the makeup of the board of county commissioners. By virtue of a special proviso to

that law,[2] however, Island County has been permitted districts of substantially unequal populations. The division of Island County into these districts, in combination with the applicable primary and general election procedures, assures the voters from district three that even though they comprise less than 10 percent of the total population and just over 15 percent of the registered voters, a candidate chosen from that district by that district alone in the primary election, nonetheless exercises one–third of the voting power of the entire county as an elected county commissioner.

The problem presented to this court is that of determining how far the one person, one vote principle first stated in *Reynolds v. Sims,* 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964) and *Lucas v. Forty–fourth Gen. Assembly,* 377 U.S. 713, 12 L. Ed. 2d 632, 84 S. Ct. 1459 (1964), has been extended by the United States Supreme Court. These cases represented the Supreme Court's first application of this principle to state legislative apportionment, after its enunciation and refinement in the context of federal congressional and statewide elections. *See Baker v. Carr,* 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962); *Wesberry v. Sanders,* 376 U.S. 1, 11 L. Ed. 2d 481, 84 S. Ct. 526 (1963); *Gray v. Sanders,* 372 U.S. 368, 9 L. Ed. 2d 821, 83 S. Ct. 801 (1963). The court in *Reynolds* noted at page 567: "the basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." The court further observed that the strict equality requirements of federal congressional

---

[2]RCW 36.32.020(1) provides as follows:

"(1) The commissioners of any county composed entirely of islands may divide their county into three commissioner districts without regard to population, except that if any single island is included in more than one district, the districts on such island shall comprise, as nearly as possible, equal populations;"

districting[3] might not apply with equal stringency to state legislative apportionment; greater deviation from equal population might be permissible where demonstrably based on legitimate considerations incident to the effectuation of a rational state policy. However, the court tempered this observation by rejecting the validity of some potential justifications for deviation from equality:

> neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population–based representation. . . . Modern developments and improvements in transportation and communications make rather hollow, in the mid–1960's, most claims that deviations from population–based representation can validly be based solely on geographical considerations.

(Footnote omitted.) *Reynolds v. Sims, supra* at 579–80. Furthermore, the court emphasized that state policy considerations would be sufficient as explanation only for *minor* deviations from equality; any policy considerations must be subordinate to the substantial equality requirement: "Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds,* at 579. Thus, substantial population equality is the touchstone for all apportionment schemes.

The apportionment principles of *Reynolds* and *Lucas* were held to apply to local governmental units in *Avery v. Midland County,* 390 U.S. 474, 484–85, 20 L. Ed. 2d 45, 88

---

[3]The requirement of population equality is exceedingly strict in federal congressional apportionment. The court has stated in *Kirkpatrick v. Preisler,* 394 U.S. 526, 531, 22 L. Ed. 2d 519, 89 S. Ct. 1225 (1969): "[The Constitution] permits only the limited population variances which are *unavoidable* despite a good–faith effort to achieve *absolute equality,* or for which justification is shown." (Italics mine.) The court has implemented this strong language equally strongly. In *Kirkpatrick,* the court declared unconstitutional Missouri's total deviation of 5.97 percent from absolute equality. In *White v. Weiser,* 412 U.S. 783, 37 L. Ed. 2d 335, 93 S. Ct. 2348 (1973), a deviation of only 4.13 percent was held to be too great. See footnote 5 for explanation of deviation percentage computations.

S. Ct. 1114 (1968). The court there held: "the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body." This court, therefore, is bound to require substantial population equality in the Island County commissioner districts if the primary election process here contravenes the one person, one vote principle through population inequality. That, in turn, depends upon two factors: (1) the interest which that principle protects, and (2) its application to primary elections.

The key interest protected by the one person, one vote principle is the weight of each voter's ballot. Districts can vary in size as long as that variation is not reflected in the relative value of the franchise. This principle is illustrated by two Supreme Court cases.

The earlier of these cases is *Dusch v. Davis,* 387 U.S. 112, 18 L. Ed. 2d 656, 87 S. Ct. 1554 (1967). Under the facts of that case, the city of Virginia Beach was consolidated with Princess Anne County and seven boroughs were created. The population of the seven ranged from a low of 733 to a high of 29,048. Under an election scheme challenged in that case the council was composed of 11 members. Four positions were at large, without regard to residence. Seven positions had district residency requirements—residency within a particular borough was necessary to qualify for each position. However, all positions were subject to city-wide, not intradistrict, election. This procedure applied at the primary election stage as well as at the general election. The court held, at page 115: "The fact that each of the seven councilmen must be a resident of the borough from which he is elected, is not fatal." The court approved the plan because it "uses boroughs in the city 'merely as the basis of residence for candidates, not for voting or representation.'" It was proper because "'[t]he plan does not preserve any controlling influence of the smaller boroughs, but does indicate a desire for intelligent expression of views . . . of the entire population.'" *Dusch,* at 116.

*Dallas County v. Reese,* 421 U.S. 477, 44 L. Ed. 2d 312, 95 S. Ct. 1706 (1975), relied upon by the majority here, presented a similar issue. Four residency districts of disparate sizes were established for county commission elections. However, again, elections were county wide. The court approved the plan, because voting and principles of equal representation were not affected by the inequality of the district populations. It repeated the central thesis of *Dusch* in a quotation from *Fortson v. Dorsey,* 379 U.S. 433, 438, 13 L. Ed. 2d 401, 85 S. Ct. 498 (1965):

> [W]hen an official's "tenure depends upon the county–wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district." Because the districts in the present plan are used "merely as the basis of residence for candidates, not for voting or representation," [*Fortson, Dusch*] each commissioner represents the citizens of the entire county and not merely those of the district in which he resides.

*Dallas County v. Reese, supra* at 479–80.

The essential premise of *Dusch* and *Dallas County* is that each voter necessarily has an equally weighted vote in a county–wide election, and that until population inequality impinges upon the weight and quality of the *franchise itself* there is no violation of the one person, one vote principle. Residency may have little to do with one's constituency if, to be a successful candidate, one's views must appeal to the majority of the electorate. Thus, a sharp dichotomy is drawn between residency requirements and regulations directly affecting the relative strength of a voter's ballot and the ability to achieve representation.

At issue here, of course, is not a mere residency requirement, but the power to nominate candidates to be commissioner. In light of the principle enunciated by the United States Supreme Court in its opinions discussed above, the scheme operating in Island County properly should be ruled invalid.

I recognize that the general election procedure, standing alone, violates none of the principles set forth above. This

should not affect the analysis applied. Primary elections are clearly sufficiently fraught with state action to invoke constitutional guaranties, and "the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election." *Smith v. Allwright,* 321 U.S. 649, 664, 88 L. Ed. 987, 64 S. Ct. 757, 151 A.L.R. 1110 (1944). This principle is applied to reapportionment controversies. *Gray v. Sanders,* 372 U.S. 368, 9 L. Ed. 2d 821, 83 S. Ct. 801 (1963).

The vice in the scheme before the court is that at the general election, the first time a truly representative vote is cast, the county–wide voters are presented a limited choice already preselected by the voters from the underpopulated district. These candidates need not necessarily have expressed views that would be attractive to the county as a whole, and may in fact be committed only to the narrowest of regional interests. For this reason, the voters in the least populous districts carry more power in the commissioner selection process with their primary votes than do those of other districts.

The requirement that a candidate be first acceptable to a disproportionately small constituency before qualifying to become eligible for general election violates the essential principle that districts may not exercise elective power over representation which is substantially more than commensurate with their relative population. I cannot agree with the majority's conclusion that the intradistrict primary election here is analogous to the mere residency requirements of *Dusch* and *Dallas County.* Voters do not select the candidates eligible for county–wide election under residency requirements; district residents have no power to validate or veto the candidacy of those who file for office. The *voting process itself* is essential in Island County's primary scheme in determining the candidates for county–wide election. The residency requirements of *Dusch* and *Dallas County* and the provisions for primary election here are on opposite sides of the Supreme Court's dichotomy between the permissible and the impermissible.

The fact that in other counties only one–third of the eligible voters participate in the nomination of any particular commissioner is not pertinent to the issue. The system as it applies where districts are of equal population size is free from defect. To the extent the statutory nominating procedure generally advantages or disadvantages particular voters regarding the election of particular officials, it does so even–handedly. Where districts are of equal population size, each voter participates in the nomination procedure affecting only his district's commissioner. But his ability to affect the ultimate makeup of the county board is no greater or smaller than that of any other voter in the county. It is this equality among the citizens as voters which the constitution mandates and which is lacking in Island County.

The availability of nomination by minor party convention, pursuant to RCW 29.24, as an alternative to the primary procedure, is similarly of no import. The majority recognizes that this procedure, too, is available only to those electors in the district from which the commissioner is to be nominated. It would appear to suffer from the same constitutional infirmity as the primary procedure where the districts are substantially unequal in population.

The appellants contend that the enormous disparities evident here are justifiable as rational implementations of important state policy. However, while I sympathize with the policies asserted, the disparities here are simply too great to be subject to constitutional justification. Although policy considerations may allow for minor deviations, the policy justifications may operate to validate only those schemes which fall within the parameters of the controlling principle of substantial population equality.[4]

---

[4]I do not suggest that unique local concerns can never be reconciled with a constitutionally valid political scheme. In *Abate v. Mundt*, 403 U.S. 182, 29 L. Ed. 2d 399, 91 S. Ct. 1904 (1971), the court declined to find unconstitutional a system of county government in which each of five different sized towns in the county had its own representation on the county legislature. The critical feature of the system in *Abate* was closely proportionate representation of the town populations

In this case, the population ratio of the largest district to the smallest is 6.87 to 1. The combined percentage deviation from the average is 168.62 percent.[5] Even with the registered voter figures substituted for the population statistics, the ratio would be 3.05 to 1, and the percentage deviation 95.18 percent. Under either set of figures the disparity is far too great to meet the bedrock requirement of substantial population equality.

Although the Supreme Court has cautioned that the figures in past cases are not precise guides for determining the result in future cases, see *Swann v. Adams,* 385 U.S. 440, 17 L. Ed. 2d 501, 87 S. Ct. 569 (1967), *Mahan v. Howell,* 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973), they are useful in obtaining a general understanding of what is meant by "substantial population equality." Ratios of 1.08 and 1.10, representing percentages of 7.83 and 9.9 percent, were found not to make out a prima facie case of equal protection violation in *Gaffney v. Cummings,* 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973) and *White v. Regester,* 412 U.S. 755, 37 L. Ed. 2d 314, 93 S. Ct. 2332 (1973). In *Mahan,* a ratio of 1.18 and a percentage of 16.4 percent was upheld, with the observation, at page 329, that "this percentage may well approach tolerable limits." Ratios of 1.30 to 1 and 1.31 to 1, representing 25.65 and 26.48 percent, were disapproved absent compelling proof of necessity in *Swann v. Adams, supra,* and *Kilgarlin v. Hill,* 386 U.S. 120, 17 L. Ed. 2d 771, 87 S. Ct. 820 (1967). Finally, ratios of 3.6 to 1 (115.44 percent) and 2.6 to 1 (88 percent)

---

through variation in the number of representatives each town elected to county positions.

[5]The ratio and percentage deviation figures are the measures that the Supreme Court has used to evaluate reapportionment schemes. The ratio figure is obtained by simply comparing the population of the largest district with that of the smallest. The percentage deviation figure is obtained by ascertaining, first, the average size of the districts. The percentage by which the largest district is over-populated and the percentage by which the smallest district is under the average are computed and these two figures are added together to yield the total maximum deviation figure.

were struck down absolutely in *Lucas v. Forty–fourth Gen. Assembly,* 377 U.S. 713, 12 L. Ed. 2d 632, 84 S. Ct. 1459 (1964), and *WMCA, Inc. v. Lomenzo,* 377 U.S. 633, 12 L. Ed. 2d 568, 84 S. Ct. 1418 (1964). The fate appropriate to the instant scheme is self–evident.

In summary, I would hold unconstitutional the primary and general election laws existing in this state as related to Island County which allow each voter in the less populous county districts to exercise a more strongly–weighted vote in selecting county commissioners than those residents of the more populous counties. As existing now, the law exceeds the permissible deviations allowable under the equal protection clause of the fourteenth amendment to the United States Constitution.

A holding of constitutional infirmity in the instant scheme would not improperly intrude upon the legislature's prerogative to design, within constitutional limits, a representative local governing structure. It would rather carry out our responsibility, affirmed in our oath of office, jealously to protect the constitutional liberties of the electorate. We must do this by assuring each vote is of substantially the same weight as any other vote in the primary election in Island County. This is admittedly absent under the holding of the majority.

STAFFORD, BRACHTENBACH, and HOROWITZ, JJ., concur with UTTER, C.J.

Reconsideration granted March 15, 1979.